1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DERRICK CLARK, et al.,** | **Case No. C 96-1486 CRB** |
| **Plaintiffs,** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **v.** | |
| **STATE OF CALIFORNIA, et al.,** | |
| **Defendants.** | |

14 I.      **Introduction and Background**

15         1.      The State of California, the Governor and various state prison officials

16 initiated the current proceedings by bringing a motion pursuant to the Prison Litigation

17 Reform Act ("PLRA"), 18 U.S.C. § 3626(b), to terminate the prospective relief in this

18 case.  That relief is contained in a 2001 Settlement Agreement and Order that requires

19 these defendants to comply with a set of policies and procedures, known collectively as

20 the Clark Remedial Plan ("CRP" or "Remedial Plan"), which they drafted to ensure that

21 California prisoners with developmental disabilities were protected from serious injury

22 and discrimination on the basis of their disability.  See Americans with Disabilities Act

23 ("ADA"), 42 U.S.C. § 12132; § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a); U.S.

24 Constitution amends. VIII, XIV.  Defendants maintain that prospective relief should be

25 terminated because there are no current and ongoing violations of the plaintiff class

26 members' rights under federal law.

27         2.      Plaintiffs and members of the plaintiff class are prisoners with

28 developmental disabilities incarcerated within California's prison system.  They oppose

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

defendants' motion and seek further injunctive relief.  They argue that an order requiring compliance with the policies and procedures in the Clark Remedial Plan would be insufficient to cure those statutory and constitutional violations, and that further relief is therefore necessary.

3.     Much of the evidence before the Court is not in dispute.  First, there is no dispute about the nature of the class.  These prisoners represent an extremely small percentage of the overall prison population who, because of their disabilities, are vulnerable to physical, sexual and verbal abuse, exploitation, theft, and harassment.  They also require accommodations from the normal routines of prison life if they are to be safe and able to participate meaningfully in prison activities and programs.

4.     Second, there is no dispute about the utility of the Settlement Agreement and the Clark Remedial Plan.  Prison officials testified that the Remedial Plan has been valuable to the California Department of Corrections and Rehabilitation ("CDCR").  These witnesses also agreed that most of the Remedial Plan would continue regardless of the Court's ruling.

5.     What is in dispute, therefore, is whether the Order requiring compliance with the Plan, including monitoring by plaintiffs' counsel and Court experts, is necessary.  To help answer that question one of the Court's experts, Dr. Peter Leone, conducted a systemic review of the treatment of developmentally disabled prisoners in the CDCR.  Based on over 150 prisoner interviews, a review of extensive prison documents and interviews with 29 prison staff at the seven prisons that house a majority of class members, he concluded that "[w]hile some dedicated CDCR staff were providing appropriate services and support to inmates with DD, the system as a whole appeared indifferent to the needs of these inmates" and that "[t]he breadth and severity of problems described in this report suggest that with some exceptions, inmates with DD do not receive the protections and supports as described in the Clark Remedial Plan."  Report of Dr. Peter Leone, February 15, 2010, (Tr. Ex. 1) (Leone Report) at 4, 19.

6.     The weight of the evidence supports and amplifies Dr. Leone's conclusions. In total the evidence demonstrates that mentally retarded prisoners and those with autism spectrum disorders are verbally, physically, and sexually assaulted, exploited, and discriminated against in California prisons.  Illiterate prisoners are not given the help they need to understand or fill out important prison documents, leaving them with no way to use sick call slips or grievance forms, unless they can pay other prisoners or beg them for help.  Developmentally disabled prisoners are punished for violating prison rules that they do not understand, and are punished at hearings which they do not comprehend.  These conditions violate those prisoners' rights to be free of unlawful discrimination based on their disabilities.

7.     In 2001, defendants admitted "that they [had] violated the federal rights of plaintiffs in a manner sufficient to warrant the relief contained herein."  Settlement Agreement and Order, December 3, 2001 (Dkt # 194) (Settlement Agreement & Order), ¶ 15.  Today, defendants no longer admit that they are violating the federal rights of prisoners with developmental disabilities, nor that continued relief is necessary because of those violations.  Based upon the evidence adduced at trial, this Court disagrees.  For the reasons explained below, this Court DENIES defendants' motion for relief.  Moreover, this Court GRANTS in part and DENIES in part plaintiffs' motion for further relief.

### A.     Procedural Background

8.     California prisoners with developmental disabilities filed this action in 1996, claiming that defendants discriminated against them on the basis of their disabilities in violation of the Americans with Disabilities Act, 42 U.S.C. § 12131, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794; that defendants were depriving them of due process in violation of the Fourteenth Amendment; and that plaintiffs were living under conditions that constituted cruel and unusual punishment in violation of the Eighth Amendment. First Amended Complaint, October 31, 1996 (Dkt # 32), at 21-25.  In their First Amended Complaint, plaintiffs alleged that they were denied adequate accommodations, protection,

and services because of their developmental disabilities.  Id. at 2-4.  In particular, plaintiffs alleged that defendants did not protect the plaintiff class from physical violence and manipulation by other prisoners; denied them due process in disciplinary, grievance, parole, or other administrative proceedings; and denied them equal access to good time credits and medical and mental health care, among other prison services.  Id. at 7-9, 12-13.

9.     In 1998, at the parties' request, this Court ordered the appointment of two neutral experts to assist the parties and the Court by, among other things, evaluating defendants' proposed remedial plans and modifications to, and compliance with, the plans.  Order Appointing Experts and Prescribing Duties, August 18, 1998 (Dkt # 180).  The parties together chose Dr. Peter Leone and Dr. Melissa Warren to fill the expert roles.  Id. at 1.

10.     Over the next several years, the parties, with assistance from Dr. Leone and Dr. Warren, negotiated and agreed on specific remedial measures necessary to protect class members' rights, formalized in the CRP.  The CRP sets forth policies for identifying, classifying, housing, and accommodating each class member, based upon the individual prisoner's level of disability.  In the Settlement Agreement and Order filed with this Court on December 3, 2001, defendants admitted "that they [had] violated the federal rights of plaintiffs in a manner sufficient to warrant the relief contained herein."  Settlement Agreement & Order, ¶ 15.  Defendants agreed to implement the CRP, subject to monitoring by plaintiffs' counsel, evaluation by the Court experts, negotiation between the parties, and, if necessary, enforcement by the Court.  Id. ¶¶ 5, 8.  Specifically, they agreed that "[t]he Court shall retain jurisdiction to enforce the terms of this agreement.  The Court shall have the power to enforce the agreement through specific performance and all other remedies permitted by law."  Id. ¶ 5.  As part of the settlement, all parties agreed that Dr. Leone and Dr. Warren would continue in their roles as Court experts, with the same duties set forth in the Court's Order from August 18, 1998.  Id. ¶ 6.

11.     On July 24, 2009, defendants filed a motion to terminate the Settlement

Agreement & Order, claiming that there are no current or ongoing violations of plaintiff class members' federal rights.  Defendants' Motion to Terminate Settlement Agreement, July 24, 2009 (Motion to Terminate) (Dkt #205).  In the same motion, defendants moved to dismiss relief in this case pursuant to Federal Rule of Civil Procedure 60(b)(5).  Plaintiffs filed an opposition on August 7, 2009, alleging that defendants had not met their burden of proof and that current and ongoing violations of the rights of the plaintiff class justified the continuation of relief in this case.  Plaintiffs' Opposition to Defendants' Motion to Terminate Settlement Agreement, August 7, 2009 (Opposition to Termination Motion) (Dkt # 244).  On March 9, 2010, plaintiffs filed a motion for further relief (Dkt # 329), which defendants opposed on April 5, 2010 (Dkt # 384).

12.      This Court held an evidentiary hearing to determine whether there exist current and ongoing violations of federal law and, if so, whether further relief is necessary to cure those violations.  The hearing began on May 10, 2010, and continued until May 18, 2010.  Clerk's Notice, April 12, 2010 (Dkt # 395); Civil Trial Minutes, May 18, 2010 (Dkt #465).

13.      In preparation for the hearing, the Court's expert in this case, Dr. Peter Leone, visited seven institutions, spoke with 152 class members and 29 staff members, and reviewed prisoner files and other documents.  Peter Leone Expert Report (Tr. Ex. 1) at 2-3.  Based on these visits, Dr. Leone produced an expert report on February 15, 2010, detailing his findings and his recommendations.  See generally id.

14.      During the six-day trial, this Court heard testimony from three expert witnesses and more than 30 lay witnesses (18 by deposition), including class members, correctional administrators, and prison staff members.  The parties also submitted into evidence close to 700 trial exhibits.

**B.      Statutory Framework for the Motions**

**1.      Defendants' Motion to Terminate or Dismiss Relief**

15.      Defendants move to terminate the Settlement Agreement & Order under the

Prison Litigation Reform Act, 18 U.S.C. § 3626.  Although that statute provides an avenue to terminate prospective relief instituted to remedy unlawful prison conditions, id. at § 3626(b)(1)-(2), termination is not appropriate if a court makes written findings, based on the record, that "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and . . . is narrowly drawn and the least intrusive means to correct the violation." Id. § 3626(b)(3).  In determining whether there is a "current and ongoing violation" of federal law, courts must "take evidence on the current circumstances at the prison[s]." Gilmore v. California, 220 F.3d 987, 1010 (9th Cir. 2000).  This Court has ruled that defendants, as the party moving for termination, bear the burden of proving that no such violations exist.  Order Regarding Burden of Proof, April 2, 2010 (Dkt # 382); see also Gilmore, 220 F.3d at 1007-08.  As noted below, even if plaintiffs bore the burden, they have satisfied it.

16.    Defendants also claim that changed circumstances necessitate the dismissal of the Settlement Agreement & Order.  Under Federal Rule of Civil Procedure 60(b)(5), a court may relieve a party from its obligations pursuant to a final judgment if "applying [the judgment] prospectively is no longer equitable."  The moving party must demonstrate, however, "a significant change either in factual conditions or in law." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992).  In institutional reform cases, district courts must ask whether such a change "renders continued enforcement [of the judgment] 'detrimental to the public interest.'" Horne v. Flores, 129 S. Ct. 2579, 2593 (2009) (quoting Rufo, 502 U.S. at 384).  Defendants' desire to put a consent decree behind them does not justify such relief: "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree." Rufo, 502 U.S. at 383.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17.   The PLRA also requires that the Court "promptly rule on any motion to . . . terminate prospective relief in an action with respect to prison conditions."  18 U.S.C. § 3626(e)(1).  Prompt resolution is necessary because, under the PLRA, a termination motion stays all prospective relief until the Court enters a final ruling.  Id. § 3626(e)(2).

## 2.   Plaintiffs' Motion for Enforcement and Further Remedial Orders

18.   Plaintiffs move for enforcement of, and further relief under, the Settlement Agreement & Order in this case.  Pursuant to that Agreement, defendants committed to implement the CRP.  The CRP is a series of measures developed with the assistance of Court-appointed experts and designed to address, in a "fair and reasonable" manner, the violations of federal law that plaintiffs had identified in their complaint.  Settlement Agreement & Order, ¶ 15.  In agreeing to the Remedial Plan, defendants acknowledged that "they had violated the federal rights of plaintiffs in a manner sufficient to warrant the relief contained herein."  Id.; see also Subia at RT 256:7-12 ("[w]hen I first came into this department . . . we would just watch[] these inmates who are filthy and walking around looking at the sun and picking up bugs and eating them on the facility and consistently getting into trouble.").  As the Court has noted and defendants have conceded, "as of 2001, the parties agreed that there was a need at that point, there were violations at that point, there was a plan at that point, and the plan was narrowly drawn at that point."  RT 8:14-17; see also Settlement Agreement & Order at ¶ 15.

19.   The Court "retain[s] jurisdiction to enforce the terms of this agreement."  Settlement Agreement & Order at ¶ 5.  Moreover, the Settlement Agreement & Order contemplated that plaintiffs could bring a motion for enforcement and further relief in circumstances such as those presented here, by expressly allowing plaintiffs to move to modify "if the plan does not effectively remedy defendants' violations or if a modification is necessary to ensure plaintiffs receive adaptive support services to which they are entitled under the ADA, § 504 [of the Rehabilitation Act], or the Constitution."  Id. ¶ 11.  Plaintiffs bear the burden of proving that enforcement or modification of the Remedial

Plan is necessary to address defendants' violations of federal law.

###### C.   Defendants' Obligations under Federal Law

####### 1.   ADA and § 504

20.   Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" suffers from a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to "caring for oneself . . . , learning, reading, concentrating, thinking, communicating, and working." Id. § 12102(1)(A), (2)(A).  It is undisputed that the Clark class members fit these criteria.  See Settlement Agreement & Order ¶¶ 1-2, 15; see also CRP (Tr. Ex. 476) at 1.  Furthermore, state prisons are "public entities" for the purposes of Title II.  Penn. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 210 (1998).

21.   Section 504 of the Rehabilitation Act guarantees the same right of non-discrimination to disabled individuals "under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  Because Title II of the ADA was modeled on § 504, "courts have applied the same analysis to claims brought under both statutes." Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) (citations omitted); see also 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [§ 504] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination in violation of [section 12132 of this title].").  Moreover, "courts routinely look to Rehabilitation Act case law to interpret the rights and obligations created by the ADA." Zukle, 166 F.3d at 1045 n.11.  Like Title II of the ADA, § 504 applies to state prisons. Armstrong v. Wilson, 124 F.3d 1019, 1023 (9th Cir. 1997).

22.   Under the ADA and the Rehabilitation Act, defendants must provide Clark class members with "reasonable accommodations" and "reasonable modifications" so that

they can avail themselves of prison services and participate in prison programs and activities. 29 U.S.C. § 794; 28 C.F.R. § 35.130(b)(7); see also The Americans with Disabilities Act Title II Technical Assistance Manual, § II-3.6100 (requiring public entities to make reasonable modifications to their policies, practices, or procedures to avoid discrimination), *available at* http://www.ada.gov/taman2.html.[1] To be "reasonable" the accommodation or modification must give disabled prisoners "meaningful access" to the service, program, or activity in question. Alexander v. Choate, 469 U.S. 287, 301 (1985).

23.    The ADA encompasses all services, programs, and activities provided by a prison to its prisoners. See, e.g., Crawford v. Ind. Dep't of Corrs, 115 F.3d 481, 483 (7th Cir. 1997) ("The use of a library is, equally clearly, an activity, and so, only a little less clearly, is the use of the dining hall."); Chase v. Baskerville, 508 F. Supp. 2d 492, 506 (E.D. Va. 2007) (defining the provision of "telephones, computers, cable televisions, and books" as "services" under the ADA). Thus, "virtually every interaction between prison officials and disabled inmates potentially exposes the State[] to liability . . . unless the State[] promptly provide[s] reasonable accommodation." Chase, 508 F. Supp. 2d at 505 (citing Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 289-90 (1st Cir. 2006); Chisolm v. McManimon, 275 F.3d 315, 327-30 (3d Cir. 2001)).

### 2.    Eighth Amendment

24.    The Eighth Amendment prohibits the government from exacting "cruel and unusual punishment" on its citizens. U.S. Const. amend. VIII. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). As such, prison officials "must provide humane conditions of confinement . . . and must

---

[1] Because the Title II Technical Assistance Manual provides the Department of Justice's interpretation of its own regulations, it "must . . . be given substantial deference and will be disregarded only if 'plainly erroneous or inconsistent with the regulation.'" Bay Area Addiction Research & Treatment, Inc. v. City of Antioch, 179 F.3d 725, 732 n.11 (9th Cir. 1999) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).

take reasonable measures to guarantee the safety of the inmates."  <u>Farmer v. Brennan</u>, 511
U.S. 825, 832 (1994) (internal quotations and citations omitted).

25.     For an Eighth Amendment violation to lie, the deprivation suffered by the
prisoner must be sufficiently serious, and prison officials must be "deliberately
indifferent" to the deprivation.  <u>Farmer</u>, 511 U.S. at 834.  A prisoner need not establish
that he actually suffered a sufficiently serious deprivation; he must show only that "he is
incarcerated under conditions posing a substantial risk of serious harm."  <u>Id.</u> (citing
<u>Helling</u>, 509 U.S. at 35).  As explained by the Supreme Court, it would be illogical "to
deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in
their prison on the ground that nothing yet had happened to them . . . .  [A] remedy for
unsafe conditions need not await a tragic event."  <u>Helling</u>, 509 U.S. at 33.

26.     "[D]eliberate indifference can be predicated upon knowledge of a victim's
particular vulnerability (though the identity of the ultimate assailant not known in advance
of attack), or, in the alternative, an assailant's predatory nature (though the identity of the
ultimate victim not known in advance of attack)."  <u>Brown v. Budz</u>, 398 F.3d 904, 915 (7th
Cir. 2005).

### 3.     Fourteenth Amendment Due Process

27.     The Fourteenth Amendment provides that no state shall "deprive any person
of life, liberty, or property[] without due process of law."  U.S. Const. amend. XIV, § 1.
In the prison context, "States may under certain circumstances create liberty interests
which are protected by the Due Process Clause."  <u>Sandin v. Conner</u>, 515 U.S. 472, 483-84
(1995); <u>see also</u> <u>Youngberg v. Romero</u>, 457 U.S. 307, 307 (1982) (involuntarily
committed, mentally retarded individual had "constitutionally protected liberty interests
under the Due Process Clause").  Specifically, due process protections attach to state
actions that (1) affect a prisoner's sentence in an unexpected manner, or (2) impose an
"atypical and significant hardship on the inmate in relation to the ordinary incidents of
prison life."  <u>Sandin</u>, 515 U.S. at 484.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.    The Clark Remedial Plan

28.    In 2001, the parties agreed that the CRP represented the narrowest, least intrusive set of procedures that could effectively ensure the federal rights of developmentally disabled prisoners.  From that time, the CRP has served as the cornerstone of defendants' efforts to comply with the Settlement Agreement reached by the parties and effectuated by this Court.

#### 1.    Identification

29.    As a threshold matter, defendants must ensure that developmentally disabled prisoners are properly identified in order to provide reasonable accommodations to those prisoners under the ADA and § 504.  See Armstrong v. Davis, 275 F.3d 849, 876 (9th Cir. 2001) (because regulations implementing ADA require public entity to accommodate persons identified as disabled, tracking system is necessary part of compliance).  The CRP also requires that "[e]fforts to identify inmates with developmental disabilities . . . be continuous."  CRP at 14.

#### 2.    Reading and Writing Assistance

30.    A developmentally disabled prisoner's literacy level can impede his or her ability to use prison services or participate in prison activities or programs.  Garcia v. Taylor, No. 07-cv-474, 2009 WL 2496521, at *11 (N.D. Fla. Aug. 11, 2009).  Thus, the regulations implementing the ADA require public entities to "take appropriate steps" to ensure that the communication of information concerning prison services, activities, and programs is "as effective" for the disabled as for the non-disabled.  28 C.F.R. § 35.160.  In doing so, the prisons must provide such services as are necessary "to afford an individual with a disability an equal opportunity to participate in" prison programs and activities.  Id. In determining what services are necessary, defendants must give "primary consideration to the requests of the individual."  Id.

31.    As stated by one appellate court charged with determining whether a prison library provided meaningful access to its materials, "[i]t is not enough simply to say the

books are there, when the plaintiffs contend that they do not have the assistance necessary to use the books properly."[2]  Cruz v. Hauck, 627 F.2d 710, 720 (5th Cir. 1980).

32.     The CRP recognizes that developmentally disabled prisoners "may have poor ability to express themselves . . . in writing."  CRP at 6.  Further, "[t]hey will likely have difficulty with any task requiring reading or processing written material," and, in particular, "they may have difficulty with disciplinary, classification, and/or appeal processes[, which] require reading and understanding."  Id.  Accordingly, corrections officers are duty-bound to provide reading and writing assistance to the Clark class members who need it.  See id. at 42 (officers must "[p]rovide support services as directed by [the prisoner's Interdisciplinary Support Team]").  And designated institutions "must ensure that [CDCR] notices, orientations packages, announcements, and similar printed materials are accessible to inmates with developmental disabilities."  Id. at 45.

### 3.     Meaningful Assistance in Disciplinary, Administrative, and Classification Proceedings

33.     As noted above, defendants must, under the ADA, "take appropriate steps" to ensure that staff members' communications with developmentally disabled prisoners are "as effective" as their communications with non-disabled prisoners.  28 C.F.R. § 35.160.  Accordingly, defendants must not only provide staff assistants to developmentally disabled prisoners in disciplinary, administrative, and classification proceedings, but they also must ensure that those staff assistants are providing the prisoners with effective communication.  Cf. Duffy v. Riveland, 98 F.3d 447, 456 (9th Cir. 1996) (reversing summary judgment in favor of prison on deaf prisoner's claim that he was denied qualified interpreter at disciplinary hearing in violation of ADA).  The

---

[2] Indeed, because the Rehabilitation Act's goals "should . . . mirror the goals of prison officials as they attempt to rehabilitate prisoners and prepare them to lead productive lives once their sentences are complete," providing prisoners with reading and writing assistance – in an effort to "ensur[e] that inmates have meaningful access to prison activities" – serves "the goals of both the institution and the Rehabilitation Act."  Bonner v. Lewis, 857 F.2d 559, 562 (9th Cir. 1988).

Remedial Plan expressly recognizes this obligation.  CRP at 8; <u>see also</u> <u>id.</u> at 42 (DDP counselor must serve as staff assistant as required), 61-62 (requiring training for staff assistants).

34.     Only through effective communication can defendants guarantee that developmentally disabled prisoners have meaningful access to these proceedings and, thus, satisfy their obligations to plaintiff class members under federal law.  And, "[b]y ensuring that inmates have meaningful access to . . . [such] proceedings . . . , the goals of both the institution and the Rehabilitation Act are served."  <u>Bonner v. Lewis</u>, 857 F.2d 559, 562 (9th Cir. 1988).

35.     The ADA also requires that prison staff try to counsel <u>Clark</u> class members, rather than subjecting them to the disciplinary process, when they break prison rules that they do not understand.  The Ninth Circuit has "repeatedly recognized that facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced."  <u>McGary v. City of Portland</u>, 386 F.3d 1259, 1265 (9th Cir. 2004) (citations omitted); <u>cf.</u> <u>Salley v. Circuit City Stores, Inc.</u>, 160 F.3d 977, 981 (3d Cir. 1998) (in employment context, entity "may not use established policies regulating behavior to short-circuit the required analysis of whether . . . a reasonable accommodation" is due to disabled person).  In accordance with that precedent, the CRP mandates that, when addressing prisoner misconduct, staff members "must take into consideration the severity of the inmate's disability and the inmate's need for adaptive services when determining the [appropriate] method of discipline."  CRP at 49.  When the prisoner does not understand that he has broken a rule, staff should provide the "reasonable accommodation" of "direct instructions, prompting, or verbal counseling."  <u>Id.</u>  Only if the developmentally disabled prisoner continues to engage in the misconduct should the employee resort to the disciplinary process.  <u>Id.</u>

36.     Like the ADA, § 504, and the CRP, the Due Process Clause requires that staff assistants provide effective communication to developmentally disabled prisoners

during disciplinary proceedings where there is a protected liberty interest at stake.

37.     "Due process [also] requires that a prisoner have 'an opportunity to present his views' to the official 'charged with deciding whether to transfer him to administrative segregation.'" Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990) (quoting Hewitt v. Helms, 459 U.S. 460, 476 (1983)).

### 4.     Meaningful Access to Prisoner Grievance Procedures

38.     Prison grievance procedures must be "readily available to all . . . inmates," and staff must make "appropriate provisions" to communicate those procedures to "the impaired and the handicapped." 28 C.F.R. § 40.3. Moreover, institutions must "ensure that the procedure[s are] accessible to impaired and handicapped inmates." Id. § 40.4. The regulations implementing the ADA also require defendants to "adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by [the Act]." 28 C.F.R. § 35.107(b).

39.     Because access must be "meaningful," Alexander, 469 U.S. at 301, prison staff must ensure that developmentally disabled prisoners can submit grievances. See Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995) ("The right of meaningful access to the courts extends to established prison grievance procedures." (citation omitted)). In recognition of this obligation, the Clark Remedial Plan requires staff members to "provide the necessary assistance to all DDP inmates on a case-by-case basis to ensure that those who have difficulty . . . communicating in writing will be provided reasonable access to [grievance] procedures." CRP at 45.

40.     The right of meaningful access to grievance procedures is particularly important because a prisoner must exhaust the prison's administrative remedies by complying with that procedure before he can access the courts. 42 U.S.C. § 1997e(a). As the Ninth Circuit has recognized, "[t]he reality and substance of any of a prisoner's protected rights are only as strong as his ability to seek relief from the courts or otherwise to petition the government for redress of the deprivation of his rights." Bradley, 64 F.3d

at 1280.

### 5.    Assistance with Self-Care and Daily Living Activities

41.    Like almost all services provided by a prison, daily living activities such as the use of showers, the exchange of laundry, and the receipt of medication constitute "services, programs, or activities" under the ADA and § 504.  See, e.g., Phipps v. Sheriff of Cook County, 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009) ("showering, toileting, and lavatory use . . . regarded as programs and/or services under the ADA").

42.    In recognition that developmentally disabled prisoners "may show evidence of poor self care[, such as] seldom bathing, soiled or unkempt clothing, poor eating habits," and a "disorganized" or "dirty" living area, the CRP extends the same obligations to defendants.  CRP at 6, 8; see also id. at 42 (officers must "[p]rovide support services as directed by [the prisoner's Interdisciplinary Support Team]").

### 6.    Protection from Abuse

43.    Defendants acknowledge that they "have a duty to protect all inmates, including members of the [p]laintiff class, from violence at the hands of other inmates." Defendants' Trial Brief, March 26, 2010 (Dkt # 361), at 15 (citing Clem v. Lomeli, 566 F.3d 1177, 1181 (9th Cir. 2009)).  Defendants also recognize that the developmental disabilities of Clark class members put those prisoners at greater risk for abuse and exploitation than non-developmentally disabled prisoners.  Subia at RT 247:8-15. Specifically, developmentally disabled prisoners "may give up possessions to other inmates" or "become vulnerable to sexual predators [or] manipulation by other inmates." CRP at 6.  Accordingly, in adopting the CRP, defendants acknowledged that it was necessary for prison staff members to monitor these prisoners to promote their personal safety.  Id. at 8, 42. Also for safety reasons, defendants agreed to accommodate Clark class members in the housing assignment process.  For example, DD1s with abuse concerns and DD2s "must only be placed in the building designated for [them]," and "[n]on-DDP inmates with a history of sexual [abuse] and/or predatory behavior against

'weaker' individuals' must not be housed in . . . designated buildings." <u>Id.</u> at 39-40.

44.     Failing to accommodate plaintiff class members in these manners also raises concerns under the Eighth Amendment.  When a prisoner demonstrates either that he has suffered physical or sexual assault at the hands of other prisoners, or that he lives with the "substantial risk" of such assault, he establishes "sufficiently serious deprivation" and, presuming the institution's deliberate indifference to that deprivation, the infliction of cruel and unusual punishment.  <u>See</u> <u>Berg v. Kincheloe</u>, 794 F.2d 457, 460-61 (9th Cir. 1986) (prisoner who was beaten and raped by another prisoner stated an Eighth Amendment claim); <u>Johnson v. Johnson</u>, 385 F.3d 503, 524-27 (5th Cir. 2004) (Eighth Amendment protects prisoners from assault occasioned by staff's failure to respond to known risk of assault).  As explained below, the crucial question with regard to the Eighth Amendment is whether it has been established that Plaintiffs, on a class basis, have proved the necessary deliberate indifference.

### 7.     Adequate Notice of Parole Conditions

45.     The ADA and § 504 mandate that defendants effectively communicate conditions and terms of parole to developmentally disabled prisoners.  Because defendants provide notice of parole conditions as a service to their prisoners, they must afford plaintiff class members the "reasonable accommodation" of effective communication to ensure that the prisoners understand what they must do to avoid being reincarcerated. <u>Armstrong</u>, 275 F.3d at 861-62.

46.     Furthermore, "due process mandates that [a] petitioner cannot be subjected to a forfeiture of his liberty for [otherwise non-criminal] acts unless he is given prior fair warning [that the acts are proscribed]." <u>United States v. Grant</u>, 816 F.2d 440, 442 (9th Cir. 1987) (internal quotation and citation omitted).  While <u>Grant</u> addressed the conditions of probation, not parole, the Supreme Court has recognized that, from a due process standpoint, parole and probation are analogous.  <u>See</u> <u>Gagnon v. Scarpelli</u>, 411 U.S. 778, 782 (1973) (same liberty interests at stake in probation revocation and parole revocation

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

hearings).  As such, the Fourteenth Amendment requires that prisoners approaching parole are notified of the conditions of their parole.

47.     It is axiomatic that, to fulfill the requirements of due process, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties" of that which is noticed.  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  Given that many developmentally disabled prisoners either cannot read or do not fully comprehend what they read, the only way for defendants to ensure that plaintiff class members receive sufficient notice of their parole conditions before leaving prison is for prison staff members to effectively communicate those conditions.  Cf. Mastrangelo v. U.S. Parole Comm'n, 682 F.2d 402, 405 (2d Cir. 1982) (it would be "manifestly unfair" if petitioner was reincarcerated because he was unaware of conditions of special parole).

48.     CDCR rules track federal law in this regard.  Wells at RT 500:21-24.  Under those rules, "what's required is to have a staff member to be present . . . to effectively communicate with the inmate."  Id. at 504:18-505:1.  As an extension of this obligation, the Remedial Plan requires "[p]arole staff [to] ensure that upon reporting to a parole unit, parolees with developmental disabilities are provided parole instructions in such a manner as to ensure that the parolee understands . . . the parole process, the parolee's responsibilities, and the available assistance and services."  CRP at 57.  So that parole staff can provide this service, institutions must "notify parole field staff . . . of any inmate with a verified developmental disability, as well as identified adaptive deficits and prescribed support services."  Id. at 56.

**E.     Characteristics of CDCR and the Clark program**

49.     Basic facts regarding the California prison system and the CRP are not in dispute.

50.     CDCR includes 33 prisons, 12 community facilities, and 41 conservation camps throughout the State of California.  Joint Proposed Final Pretrial Order (Dkt # 366) at 6; Subia at RT 218:11-16.  There are currently approximately 166,000 prisoners in the

33 prisons.  Subia at RT 226:25.  There are over 100,000 parolees in California at any given time.  Id. at 230:14-18.  Every year, CDCR receives approximately 130,000 new prisoners and releases approximately the same number.  Id. at 230:19-231:1.  CDCR employs 66,000-67,000 people with approximately 600-900 custodial staff per institution.  Id. at 231:2-7.

51.     There are 1,348 prisoners currently identified as members of defendants' Developmental Disability Program (DDP).  Salz at RT 85:19-86:8.  That is the "highest [ ] point" for the number of prisoners the CDCR has had in the DDP.  Wells at RT 560:6-10.  In the past 10 years, the number of budgeted positions for DDP staff has been reduced from 143 total positions to 137 total positions.  Id. at 556:3-23.  Not all of these 137 budgeted DDP staff positions are filled.  Id. at 561:21-562:13.  Every prison in California has developmentally disabled prisoners from time to time.  Salz at RT 133:17-25.  The biggest challenge defendants face in maintaining compliance with the Clark Remedial Plan is the size of CDCR.  Subia at RT 230:7-13.

52.     At present, seven institutions are designated for permanent placement of mildly to moderately disabled prisoners (categorized as "DD1" and "DD2"):  Central California Women's Facility; California Men's Colony (CMC); California Medical Facility (CMF); California State Prison-Corcoran; California Rehabilitation Center (CRC); California State Prison-Los Angeles County (Lancaster); and the California Substance Abuse Treatment Facility and State Prison at Corcoran (SATF).  Joint Proposed Final Pretrial Order (Dkt # 366) at 7.  Five prisons are designated for permanent placement of more severely disabled prisoners (categorized as "DD3"):  California State Prison-Sacramento; Central California Women's Facility; CMC; CMF; and Valley State Prison for Women.  Id.

53.     Richard J. Donovan Correctional Facility (R.J. Donovan) currently houses prisoners who are dually diagnosed DDP and Enhanced Outpatient Program (EOP) (specialized housing for mentally ill prisoners) and retains some DDP staff.  Id.  Within

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

these institutions, staff usually designate specific units for placement of developmentally disabled prisoners.  Id.  Approximately 300 developmentally disabled prisoners are not housed in designated institutions.  Salz at RT 133:12-16.

54.     To better accommodate the particular needs of prisoners designated as developmentally disabled, CDCR "clusters" these prisoners in designated institutions. Joint Proposed Final Pretrial Order (Dkt # 366) at 7.  In other words, CDCR aims to place prisoners with similar needs together.  Id.

55.     Although most plaintiff class members are sent to designated prisons, medical and psychiatric needs may override the clustering criteria.  Id.  Thus, class members with serious medical or mental health needs may be housed in a health care setting.  Id.

56.     According to the sole defense expert, it is "essential to have a plan such as the [Clark Remedial Plan] for developmentally disabled prisoners."  Scaramozzino at RT 891:8-12.  Other witnesses agreed: the Clark Remedial Plan is "very beneficial, and . . . all parties have agreed on that from the beginning."  Salz at RT 157:23-158:1.  It is "a program that makes sense."  Id. at 159:4-23.  The Clark Remedial Plan is "very useful." Subia at RT 255:24-256:18.  "[I]t's . . . a good thing to have the [Clark Remedial Plan] and in terms of how [CDCR is] administering the prisons, it's helpful."  Id. at 257:3-6. The DDP works very well and is a necessary program.  Serna at RT 355:16-19, 356:19-21.  The Clark Remedial Plan "made some savings to the operation of the prison" by managing the problems that developmentally disabled prisoners face.  Scaramozzino at RT 892:2-14.  The Clark Remedial Plan "creates a safer environment for [CDCR] staff and for the inmates."  Subia at RT 256:19-257:2.

57.     Providing the services required by the Clark Remedial Plan does not create a burden for defendants.  Subia at RT 256:19-257:2.  The placement of developmentally disabled prisoners in the DDP ensures that these prisoners no longer "carr[y] a lot of staff time" and saves defendants money by not requiring "a lot of higher, more expensive

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

levels of custody." <u>Id.</u> at 159:17-23.  "[I]t's not a very expensive program to run."  Salz at RT 159:9.

### F.   Definition and Characteristics of Developmental Disabilities

58.     The parties are in full agreement regarding the definition and characteristics of people with developmental disabilities.  CRP at 1-2; Joint Proposed Final Pretrial Order (Dkt # 366) at 6.  There is no dispute that individuals with developmental disabilities have cognitive deficits and functional impairments.  CRP at 6-7; Dkt # 366 at 6.  The parties agree that such individuals require support accommodations and are entitled to receive them in prison.   CRP at 1-3, 7-9; Dkt # 366 at 6.  The only dispute in this case is whether prisoners with developmental disabilities are being adequately identified and accommodated.

### 1.   Individuals with Developmental Disabilities

59.     Prisoners with developmental disabilities are not always easy to distinguish from non-disabled prisoners.  According to Dr. Nancy Cowardin, only a small percentage of people with developmental disabilities have identifying physical characteristics or impairments in physical or motor skills.  Expert Report of Nancy Cowardin, Ph.D (Tr. Ex. 5) (Cowardin Report) at 10.  Dr. Donald Salz, a CDCR Chief Psychologist with oversight of the <u>Clark</u> program as it applies to mental health issues, agrees.  Salz at RT 42:4-9, 91:5-8.

60.     In addition, many developmentally disabled people work hard to mask their disabilities.  Cowardin Report at 10, 16; Cowardin at RT 626:15-23.  Masking behavior is even more common among developmentally disabled people who are considered to be higher functioning with only "mild" support needs–the majority of developmentally disabled prisoners.  Cowardin Report at 16.  Masking results in compensatory behaviors such as wearing a broken watch to provide a reason to ask another person what time it is or carrying a book to pretend to be literate.  Cowardin at RT 624:4-625:2.  Thus, plaintiff class members may appear to have skills in areas in which they actually require help.

61.     Individuals with developmental disabilities also have inconsistent and uneven skill development, which can mask areas of impairment.  Cowardin at RT 621:7-20, 626:4-14; Salz at RT 75:25-76:16; Leone at RT 781:18-25.  A person with adequate self-care skills, for example, may have significant functional impairments in other areas.  Cowardin at RT 621:7-20.  Dr. Salz described encountering a prisoner who was able to read entire novels yet was so impaired socially that he required a very high level of supervision.  Salz at RT 75:25-76:16.

62.     People with developmental disabilities might have deficits in information durability.  In other words, they might need repeated reminders, even if the task is one they have undertaken before.  Cowardin Report at 12-13; Cowardin at RT 621:21-623:3.

63.     Many individuals with developmental disabilities have trouble transferring information: taking a skill they have learned in one area and applying it to a similar task in another area.  Cowardin Report at 12-13.  At the evidentiary hearing, Dr. Cowardin described how a developmentally disabled prisoner might learn to stay inside the yellow boundary lines painted in his housing unit, but may not apply that skill to another prison if transferred.  Cowardin at RT 623:4-624:3; see also Leone at RT 769:6-10.

64.     People with developmental disabilities can function well in highly structured environments such as prisons, where personal choices regarding food, clothing and activities are eliminated.  Cowardin Report at 36.  Prisons, however, also have numerous and complex rules.  Id.  The stress of learning, understanding, remembering, and complying with the multitude of rules that govern prison life can offset the potential benefits of the highly structured environment for developmentally disabled prisoners.  Id.

65.     Dr. Cowardin reports that myths about the functional capacities of people with developmental disabilities perpetuate the idea that such "people . . . perform poorly due to ignorance, insufficient education, or poor motivation/effort . . . ."  Id. at 10.  In fact, "a developmental disability is a severe, chronic condition that manifests in the developmental period (birth through age 18), requires an array of mild to intensive

supports, and is expected to last for a lifetime.  Developmental disabilities may be
cognitive, physical, or a combination of both."  Id.; see also CRP at 1.

Mental Retardation

66.     The most common form of developmental disability is mental retardation.
Cowardin Report at 14.  Mental retardation is characterized by limitations in intellectual
functioning, typically reflected in intelligence quotients of approximately 70 or below and
concurrent limitations in adaptive behavior originating prior to the age of 18.  Id.
Limitations in adaptive behavior required to meet the criteria include deficits in at least
one of the following: conceptual skills (reading, writing, math), social skills (gullibility,
interpersonal skills, following rules) and practical skills (such as activities of daily living,
safety, use of money).  Id.

67.     Mental retardation is commonly classified as "mild," "moderate," or
"severe" in diagnostic and clinical settings.  Id. at 15.  However, the term "mild" mental
retardation is misleading.  In fact, everyone with mental retardation has significant
functional impairments, compared to people without mental retardation.  Id. at 15-16;
Cowardin at RT 630:4-631:18.  "People with mental retardation have subaverage abilities
in multiple areas that impact learning and adaptive functioning."  Cowardin Report at 12.
Thus, compared to people without mental retardation, they have "low functional skills
across the board (e.g., communication, socialization, community/home, independence,
and functional academics)."  Id.

Autism and Spectrum Disorders

68.     Autism and autism spectrum disorders are also developmental disabilities.
Id. at 13-14.  Autism is a severe cognitive disorder that "originat[es] in infancy or early
childhood" and is "characterized by self-absorption, an inability to interact socially,
repetitive behavior, language dysfunction, inflexible adherence to specific nonfunctional
routines or rituals, stereotyped and repetitive motor mannerisms, and persistent
preoccupation with parts of objects."  Id. at 13; see also Cowardin 632:7-633:24.

Asperger's Syndrome, which is an autism spectrum disorder and "considered a 'milder' variant of autism, is characterized by social isolation, clumsiness, and obsessive preoccupation with limited conversation topics."   Cowardin Report at 13; see also Cowardin at RT 633:18-24 (characterized by "perseveration on a topic" of conversation), 633:7-9 (explaining perseveration as a fixation on a particular area).

<u>Other Developmental Disabilities</u>

69.     Epilepsy, cerebral palsy, and traumatic brain injury are also developmental disabilities.  Cowardin Report at 11.  Mental illness, on the other hand, is not a developmental disability.  Cowardin at RT 631:22-24.  Mental illness can co-occur with developmental disabilities, but not all developmentally disabled people have mental illness, and vice versa.  Id. at 631:25-632:6.  Mental illness is not a cognitive disability; it does not affect intelligence.  Id. at 635:16-636:1.

## 2.     Functional Impairments of Prisoners with Developmental Disabilities

70.     The parties agree that plaintiff class members may require assistance in multiple areas.  CRP at 6-7; Salz at RT 82:21-84:16; Leone at RT 749:4-10; see generally Cowardin Report at 18-36.  The Court finds the following are examples of areas in which developmentally disabled prisoners have deficits.

71.     Many developmentally disabled prisoners have impaired communication skills.  CRP at 6; Cowardin Report at 26.  Many are unable to read and write.  Salz at RT 83:4-7, 116:18-21.  They have difficulty understanding instructions, especially multi-step instructions, and difficulty with any task that requires writing, such as filling out requests for medical or mental health care and grievances.  Cowardin Report at 25-27, 29-30, 32-33.  It is difficult for them to express themselves, and they often need assistance choosing words to make their point.  Id. at 26.  As a result, developmentally disabled prisoners often have difficulty communicating, self-advocating, and understanding what takes place during prison administrative proceedings and grievance processes.  Id. at 25-28; CRP at 6; Salz at RT 83:13-17.  They are therefore at risk for unintentionally waiving their rights.

- 23 -

CRP at 6.

72.     Many prisoners with developmental disabilities have poor socialization skills.  Id.; Cowardin Report at 18-21; Salz at RT 83:18-25.  These prisoners have a "mental youngness," Cowardin at RT 620:19, and are naive with respect to prison culture and routines.  Cowardin at RT 625:3-13; CRP at 6; Salz at RT 83:18-25.  This "mental youngness" is especially problematic in prison settings because prisoners exhibiting this characteristic are vulnerable to abuse and manipulation by other prisoners.  Cowardin Report at 19-21; Salz at RT 123:11-14, 124:21-125:4; CRP at 6.  These prisoners become easy targets for abuse "as their weaknesses becomes obvious to other prisoners in their housing units."  Cowardin Report at 19.  They might make poor social choices, such as giving their property to other prisoners, increasing their vulnerability and risk of abuse.  Id.; CRP at 6; Salz at RT 84:4-16.  They are susceptible to becoming involved in a cycle of disciplinary infractions involving other prisoners and staff members as a result of their lack of judgment and inability to understand consequences.  CRP at 6; Leone at RT 765:23-766:2; see also Cowardin Report at 18 (failure to "understand the fine points or nuance of complex social situations . . . increases the risk that they will misunderstand changing rules and regulations, make poor decisions based on confusion or misunderstanding, and get into trouble").

73.     Many prisoners with developmental disabilities are also naïve about health and safety.  These prisoners have difficulty identifying, treating, or preventing illness, administering first aid to themselves, and understanding sexuality and basic safety.  CRP at 7; Cowardin Report at 30.  This deficit is especially problematic among developmentally disabled prisoners with poor self-advocacy skills.  Because these prisoners may be masking their disabilities, are simply unaware that there is a problem, or do not know how to access assistance, they are not likely to request help.  Cowardin Report at 24-25; Cowardin at RT 624:4-12.  If they do attempt to self-advocate, they have difficulty complying with multi-step procedures for accessing resources, such as medical

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and dental services, grievances, the law library, and religious services.  Cowardin Report at 30-33.

74.     Many developmentally disabled prisoners have poor self-care skills.  Id. at 28-30; see also CRP at 6; Salz at RT 84:4-5.  They may need reminders to bathe, brush their teeth, and wash their clothes, and they can have soiled or unkempt clothing, poor eating habits, and dirty or disorganized cells.  CRP at 6; Cowardin Report at 28.  Poor hygiene further increases plaintiff class members' risk for abuse in a prison environment.  Cowardin Report at 29; Salz at RT 113:18-114:8.

75.     Prisoners are subject to "an abundance of rules regarding all aspects of their lives."  Cowardin Report at 30.  Developmentally disabled prisoners often have difficulty following rules and seeking needed assistance.  CRP at 6; Salz at 114:9-115:2.  Because they have "[i]ssues pertaining to durability of learning," they require repeated reminders about the same rules.  Cowardin Report at 31.  Developmentally disabled prisoners might have difficulty understanding some rules that may be intuitive to others.  Id. at 30-31.  Thus, "[s]taff members who suspect a prisoner of being in violation of a rule must consider whether his or her disability was a factor in the transgression."  Id. at 31.  In addition, to the extent that rules are posted in writing, many plaintiff class members have difficulty reading and comprehending them.  Id.

76.     Developmentally disabled prisoners often have difficulty with self-direction and making choices.  CRP at 7; Cowardin Report at 36.  It is difficult for such prisoners to follow schedules, initiate activities that are appropriate to particular settings, complete required tasks, problem-solve, and demonstrate appropriate assertiveness and self-advocacy.  CRP at 7.  For example, these prisoners have difficulty choosing and initiating leisure activities and appropriately engaging in those activities by taking turns, communicating with others, and behaving in an acceptable manner.  Id.  A lack of self-direction can increase their vulnerability.  Cowardin Report at 18-19.

77.     Similarly, these prisoners have difficulty maintaining work assignments due

to inappropriate social behavior and a lack of relevant work skills.  Id. at 7.  They may be unable to apply functional academic skills to work assignments including managing oneself at work and communicating with individuals in the workplace.  Id.

### 3. Support Services Required by Prisoners with Developmental Disabilities

78.     The parties agree that prisoners with developmental disabilities require varied support services to access programs, services, and protection in prison.  CRP at 7-9; Salz at RT 82:25-84:16,128:6-17; see generally Cowardin Report at 18-37.

79.     Many developmentally disabled prisoners require prompting to begin or complete activities, such as showers, tooth-brushing, access to medical care, laundry exchange, and timely attendance at work and meals.  Id.; Cowardin Report at 28-30; Salz at RT 112:19-25.

80.     Prisoners with developmental disabilities require assistance by trained staff members to understand and participate in disciplinary, classification, and administrative processes.  CRP at 8; Salz at RT 83:13-17.  They require staff assistance to understand what is taking place during these proceedings.  Salz at RT 83:13-17.  They also need help choosing appropriate words to describe their positions.  Cowardin Report at 26. Where forms or documents are provided, they need help reading, writing, and understanding those forms.  Salz at RT 83:4-7; Cowardin Report at 25-28.

81.     Developmentally disabled prisoners often require monitoring and additional supervision of their safety, property, behavior, and self-care.  CRP at 8; Cowardin Report at 18-24.  Staff members must closely monitor the behavior of developmentally disabled prisoners to ensure that they are not being manipulated to give up property or to violate prison rules.  Cowardin Report at 31-32; Leone at RT 771:18-24, 772:16-20.  Monitoring is required so that developmentally disabled prisoners do not fall prey to prolonged abuse without understanding that help is available.  Cowardin Report at 21; Leone at RT 807:10-16.

82.     Many prisoners with developmental disabilities require coaching, especially

in work and academic assignments, to acquire the skills necessary to complete the activities independently.  CRP at 8; <u>see also</u> Salz at RT 84:17-85:1.

### 4. All Developmentally Disabled Prisoners Require Individualized and Proactive Help

83.     The parties agree that the level of support required by each prisoner varies. Cowardin Report at 17; Salz at RT 82:25-84:16, 85:2-5.   Moreover, staff members must consider the individual support needs of each prisoner when providing adaptive support. Leone at RT 755:5-16, 762:23-763:8; <u>see also</u> Salz at RT 122:23-123:10 (officers must monitor developmentally disabled prisoners in proceedings that implicate their due process rights).  Simply making generalizations about prisoners based on their classifications as DD1, DD2, or DD3 will not account for uneven skill development and anomalies in support needs that exist between prisoners with the same classification. Cowardin Report at 17-18; Salz at RT 75:25-76:16.  Staff members must communicate frequently with developmentally disabled prisoners to determine what adaptive supports they require to access prison programs and services.  Cowardin Report at 35-36; <u>see also</u> Salz at RT 122:6-123:2.

84.     Because of plaintiff class members' individualized support needs and uneven skill development, it is impossible to make broad generalizations about the support needs of an individual prisoner.  Cowardin at RT 621:7-622:19; Leone Report at 2; Leone at RT 749:11; Salz at RT 75:25-76:16, 91:2-18.  Rather, an individualized classification system that identifies a prisoner's required level of help in multiple areas is more appropriate.  Cowardin at RT 653:12-654:4.

85.     Developmentally disabled prisoners who are considered higher functioning and are masking their deficits may forgo asking for help if they think it will make them appear disabled.  Cowardin Report at 16.  Further, prison culture dictates that prisoners avoid seeking help from prison staff.  Salz at RT 122:6-13.  It also discourages revealing instances of abuse to staff.  Id. at 122:14-19, 126:17-127:9.

86.     Thus, it is important for staff to provide proactive assistance and to monitor

the support needs of all developmentally disabled prisoners, even those who appear high functioning.  Cowardin Report at 16, 35-37; see also Salz at RT 122:6-123-10.

### 5. CDCR Classification System for Prisoners with Developmental Disabilities

87.     Defendants have developed a system for classifying prisoners with developmental disabilities into three categories—DD1, DD2, and DD3—based on their level of support needs.  CRP at 21-23; Salz at RT 75:3-24.  Prisoners classified as DD1 are equivalent to those with "mild" mental retardation.  Cowardin Report at 16-18. Although considered higher functioning, DD1 prisoners still require a variety of adaptive supports.  Cowardin Report at 17; CRP at 21-22; Salz at RT 75:5-10.  Prisoners classified as DD2 function in the "moderate" range of mental retardation and, therefore, require more frequent prompts and adaptive supports than DD1 prisoners.  Cowardin Report at 17; CRP at 22-23; Salz at RT 75:11-16.  Prisoners classified as DD3 are in the "severe" range of impairment and require regular, intensive prompts and assistance to complete self-care and daily living tasks.  Cowardin Report at 17; CRP at 23; Salz at RT 75:17-24. The majority, approximately 55%, of the prisoners identified as developmentally disabled by defendants are DD1.  Cowardin Report at 16.  DD2 prisoners comprise 40%, and DD3 prisoners 5%, of the prisoners in the DDP.  Id.

## II.   The Weight of the Evidence Demonstrates Current and Ongoing Violations of the Federal Rights of the Plaintiff Class

### A.   Expert Testimony

88.     In addressing the central issue of whether there exist current and ongoing violations of the federal rights of plaintiff class members, the Court places great weight on the conclusions of Dr. Peter Leone, who has served as the Court's expert for 12 years. Order Appointing Experts and Prescribing Duties, August 18, 1998 (Dkt. # 180), at 1.  Dr. Leone, who was selected and agreed upon by both parties, is highly qualified to serve as an expert.  Id.  He has a Ph.D. in special education, has long standing memberships in the Council for Exceptional Children and the American Statistical Association, has received

numerous research grants over the years, and is currently a professor at the University of Maryland, where his research focuses on, among other things, behavioral problems in institutional settings.  Leone at RT 716:21-718:13.  Dr. Leone also has extensive experience working with adult corrections in Maryland, Florida, Texas, Illinois, Pennsylvania, New York, Connecticut, and New Hampshire.  Leone at RT 719:14-719:24.  Dr. Leone has prepared teachers in the Maryland Department of Corrections to work with developmentally disabled individuals and researched and prepared a report for the National Institute of Corrections on the Texas Mentally Retarded Offender Program.  Leone at RT 719:2-719:13.  Defendants have never previously challenged his ability to assess compliance with the Remedial Plan.  Leone at RT 726:8-726:11.  Nor have defendants previously questioned Dr. Leone's expertise to opine about the Developmentally Disabled Program (DDP) in the prisons.  Leone at RT 721:17-21.

89.     To reach his conclusions in this action, Dr. Leone conducted an extensive and rigorous investigation, including site visits at seven state prisons, at which more than half of the identified Clark class members reside.  Peter E. Leone, Ph.D., On the Status of Inmates with Developmental Disabilities in the California Department of Corrections and Rehabilitation, Feb. 15, 2010 (Tr. Ex. 1) (Leone Report) at 2; see also Tr. Ex. 20 (listing numbers of developmentally disabled prisoners at each prison, including those Dr. Leone visited).  He interviewed 152 prisoners (more than 10 % of identified Clark class members) and 29 prison staff members.  Leone Report at 2-3.

90.     Dr. Leone has conducted thousands of interviews of prisoners to develop his interview methodology.  Leone at RT 734:22-735:4.  For this investigation, he interviewed prisoners in a confidential setting and used a standard set of questions for his interviews.  Leone at RT 735:5-13, 732:19-24.  He developed a standardized rating system to rank prisoners' well-being at the various prisons, and placed prisoners in the three categories conservatively:  if in doubt, he categorized the prisoner as having fewer problems.  Leone Report at 5, Leone at RT 802:7-13.  He also conducted a correlation

study to determine whether developmentally disabled prisoners considered more impaired (*i.e.,* DD2 or DD3) reported proportionally more problems than developmentally disabled prisoners considered less impaired (*i.e.,* DD1). The study demonstrated that there was little or no connection between the level of a developmentally disabled prisoner's disabilities and the severity of the problems reported. Leone at RT 743:11-746:11.

91. Moreover, Dr. Leone did not take everything prisoners told him as true. Instead, using a method he calls "triangulation," he evaluated the credibility of the prisoners and corroborated the statements with other prisoners, prison documents, staff interviews, his own personal observations, and conversations with persons outside of prison. Leone at RT 729:14-730:1, 740:18-741:4.

92. The conclusions Dr. Leone reached were highly consistent with much of the testimony, deposition excerpts and evidence presented at trial. Defendants introduced no evidence at the hearing to contest any fact on which Dr. Leone based his opinions.[3] The only rebuttal defendants offered was that of Dr. Scaramozzino. As discussed *infra* in § III.C, Dr. Scaramozzino provided no credible rebuttal testimony because he is not an expert in the relevant areas and knows little about actual conditions for developmentally disabled prisoners in California prisons. Further, as § III.C sets forth in greater detail, he withdrew some of his criticisms of Dr. Leone after being presented with evidence that his assumptions were incorrect, and the remainder of the criticisms are unconvincing.

93. In sum, Dr. Leone's expertise, depth of knowledge, experience in this case, and reasonable conclusions are entitled to great weight.

## B.   Defendants Fail to Adequately Identify Developmentally Disabled Prisoners

94. The parties agree that prisoners identified as having developmental disabilities in California prisons are entitled to receive accommodations under federal law

---

[3] Defendants sought to introduce a rebuttal report after the close of evidence. For reasons explained more thoroughly below, this Court has declined to consider that evidence. Even if it were considered, the testimony and report of Dr. Leone are more credible.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and the Clark Remedial Plan.  Leone Report at 1-2; Settlement Agreement & Order (Dkt # 194) at 2; Joint Proposed Final Pretrial Order (Dkt # 366) at 6-8.  To provide those accommodations, defendants must accurately identify prisoners who are developmentally disabled.  Defendants concede that they cannot guarantee protection and accommodation for class members who are not identified.  Salz at RT 128:2-17.  Thus, it is essential that defendants accurately identify prisoners with developmental disabilities in order to ensure those prisoners receive the protections and accommodations required under the Clark Remedial Plan and federal law.  Nevertheless, the evidence at trial raises serious questions about whether defendants are identifying all prisoners with developmental disabilities.

### 1.   Multiple Reliable Sources Suggest that 2-4 % of the Prison Population is Developmentally Disabled

95.     Both the Court expert, Dr. Leone, and plaintiffs' expert, Dr. Nancy Cowardin, agree that, although they vary widely, the most conservative and reliable estimates suggest that developmentally disabled prisoners comprise at least 2-4 % of the prison population.  Leone at RT 793:13-794:1 ("[t]he prevalence currently in the system . . . is significantly below the most conservative estimates that researchers and scholars have opined about"); Leone Report, 1 n.1; Cowardin at RT 641:7-11, 644:23-645:10 (citing studies that show expectations of 2-10 % of prisoners have mental retardation); see also Cowardin Report at 15-17.

96.     Multiple studies on the prevalence of developmental disabilities in prison support the opinions of Dr. Leone and Dr. Cowardin that the prevalence rate for developmental disabilities in prison should be at least 2-4 %.  Dr. Leone relies primarily on two studies that discuss the prevalence rate of developmental disabilities in prison.  See J. Jones, *Persons with Intellectual Disabilities in the Criminal Justice System*, Int'l J. of Offender Therapy & Comp. Criminology, 723 (2007) (Jones); and J.H. Noble & R.W. Conley, Toward an Epidemiology of Relevant Attributes, *The Criminal Justice System and Mental Retardation:  Defendants and Victims* (R. W. Conley et al. eds., 1992) (Noble & Conley).  Both publications are surveys of other more in-depth studies.  Jones at 724-

25, Noble & Conley at 27-34.  The Noble & Conley text is a comprehensive survey of studies conducted for the purpose of identifying the percentage of mentally retarded people in state and federal prisons.  Noble & Conley at 28-34.  Drs. Noble and Conley identify and list the specific tests that were used in different states and describe the methods for administering testing in those states.  Id.  The Noble & Conley study identifies where the reliability of the data was tested and validated.  Id. at 28, 30.  Despite noting wide variations in the prevalence rates between states, both studies find a prevalence rate of 2% to be on the low end of rates identified by states.  Id. at 37; Jones at 724.

97.     Dr. Petersilia's report, relied on by Dr. Cowardin, like the studies cited by Dr. Leone, surveys research examining the prevalence rate of people in prison with developmental disabilities.  Tr. Ex. 477 at 25-26, J. Petersilia, *Doing Justice?  Criminal Offenders with Developmental Disabilities* (California Policy Research Center 2000) (Petersilia) at 5.  Dr. Petersilia concludes that research confirms an estimated 4-5 % of people in prison have mental retardation/developmental disabilities.  Id. at 25-26.

98.     The Court finds the opinion of the experts on this issue is reliable and persuasive.

### 2.     Defendants Have Only Identified .80 Percent of the Prison Population as Having a Developmental Disability

99.     Defendants use a three-step screening process to identify prisoners with developmental disabilities.  CRP (Tr. Ex. 476) at 3-11; Salz at RT 44:13-45:13, 46:8-47:13.  The first step in the screening process includes a brief, ten-minute IQ screen called the Quick Test.  CRP at 4-5; Salz at RT 44:11-45:13.  Only prisoners who score 80 or less on the Quick Test will move on to the second step in the screening process, a more extensive cognitive screening tool called the Test of Nonverbal Intelligence or TONI-Third Edition (TONI).  Salz at RT 44:11-45:13.  Those prisoners who score 80 or less on the TONI will be evaluated by prison staff to measure their adaptive functioning deficits in the correctional setting.  Id. at RT 46:25-47:16.  Prisoners who pass all screening tests

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

can be referred for reevaluation later by any staff member who observes behavior indicating that the prisoner may have a developmental disability.  Id. at RT 73:6-74:2; CRP at 15-16.

100.   Under the current process for screening, defendants have identified approximately 1,348 prisoners, or .80 % of the total prison population, as developmentally disabled.  Salz at RT 51:8-20, 66:13-25.  The prevalence rate of developmental disabilities in California prisons, as determined by defendants, has remained constant at .80 % since 2002 when defendants completed testing of all existing prisoners.  Id. at RT 66:13-25.

101.   None of defendants' evidence credibly explains the disparity between the two figures–the .80 % of prisoners identified by defendants and 2-4 % that Drs. Leone and Cowardin believe are in the prison system.  Defendants justify the lower figure on two grounds.  First, defendants state that since completing testing of prisoners in 2002, they have consistently identified .80 % of the population as developmentally disabled.  Id.  The Court rejects this circular reasoning.  Defendants have presented no evidence demonstrating that the screening process has been validated to ensure that it identifies developmentally disabled prisoners accurately and reliably.  And, to the knowledge of the Court expert, no validation tests have been conducted.  Leone at RT 794:2-18, 795:9-13.  Thus, the only conclusion that can be drawn from this fact is that the screening process identifies a consistent percentage of prisoners as disabled, not that the screening process *accurately* identifies a consistent percentage of prisoners as disabled.

102.   The only support for defendants' position is the testimony of Dr. Salz about the prevalence of developmental disabilities in other state prison systems.  Dr. Salz testified that he received information regarding prevalence rates in other states from a survey, based on self-reporting by states, put together by an Oklahoma prison psychologist.  Salz at RT 145:22-146:6, 146:22-24, 148:15-21, 149:1-21.  The survey is unpublished and was not offered or admitted into evidence.  Id. at 149:15-24.  Dr. Salz does not know what states are covered in the survey, what definition of developmental

- 33 -

disabilities is being used, what tests or other criteria are used, or whether the self-reported information from the states is even accurate.  Id. at 146:25-147:10, 147:22-148:8.  Furthermore, Dr. Salz admits that he is unaware of any empirical research studies regarding the prevalence rate of mental retardation in prison.  Id. at RT 64:1-9.

103.    The Court finds the opinions of experts Drs. Leone and Cowardin more reliable.  First, Dr. Leone is the neutral Court-appointed expert in this case, who has direct experience in numerous other correctional systems.  Leone at RT 719:14-7:20:5.  He has served in this role for 12 years.  Id. at RT 719:25-720:5.  Defendants have never contested his expertise to opine about the developmental disabilities program in California and, in fact, defendants have called on his expertise and opinions regarding the developmental disabilities program multiple times.  Id. at RT 720:2-721:21.  Defendants have similarly called on the expertise of Dr. Cowardin.  Cowardin at RT 616:13-617:1, 638:7-18; Cowardin Report at 7.  Dr. Salz, on the other hand, was not called as an expert by defendants, has apparently never served as an expert, has experience which is limited to California, and is responsible for the screening procedures that are being called into question.  Salz at RT 40:7-23, 42:4-9, 42:15-43:3, 64:21-66:5, 67:17-68:7.

104.    Second, the opinions of Drs. Leone and Cowardin are grounded in the scientific literature on this issue.  Both of these experts rely on published studies of the prevalence of developmentally disabled individuals in prison and published articles analyzing those studies.  Tr. Ex. 1 at 1, 4; Cowardin at RT 667:10-668:9, 670:24-674:19.  Dr. Salz, on the other hand, relies exclusively on California's experience with the results of the procedure he supervises and an unpublished informal survey by a prison psychologist from Oklahoma, neither of which is an adequate basis for his opinion.  Salz at RT 64:12-67:6, 149:15-21.  Accordingly, the Court finds that the opinions of Drs. Leone and Cowardin are entitled to more weight.

105.    Credible expert opinions compel the finding that the methodology used by defendants to identify prisoners with developmental disabilities likely under-identifies the

number of developmentally disabled people in California prisons.

**C.    The Evidence Demonstrates that Defendants Continue to Fail to Provide Plaintiff Class Members with Access to Prison Programs, Services, and Activities**

106.    Plaintiff class members are entitled to assistance and protection they need in order to have access to prison programs, services, and activities.  See *infra* § I.C.1.  That right includes assistance in disciplinary and other administrative proceedings.  See id. The weight of the evidence demonstrates that defendants fail to provide the assistance required to secure these rights.

**1.    Defendants Systematically Fail to Provide Required Help with Reading and Writing**

107.    Most developmentally disabled prisoners need help reading and writing. Salz at RT 116:18-20; 83:4-7.  If developmentally disabled prisoners who need help reading and writing do not receive assistance from staff, they cannot file grievances, complaints against staff members, or sick call slips to obtain medical or mental healthcare. Id. at RT 117:5-22.  The failure to provide such assistance violates the CRP.  Salz at RT 119:10-11.

108.    Defendants have failed to provide systemic support to developmentally disabled prisoners who require assistance reading and writing.  The Court's expert, Dr. Leone, testified that in "most cases" staff did not "respond to the . . . problems of daily living" including the "inability of many of these inmates to read or to advocate for themselves."  Leone at RT 755:5-16; see also Leone Report (Tr. Ex. 1) at 3-4, 11-14 (detailing representative evidence that Leone relied on for this conclusion); Tr. Ex. 303 (DD2 prisoner complains "there is no-one to help with" reading or writing); Tr. Ex. 237 (DD prisoner frustrated because unable to speak to DDP officer); Tr. Ex. 265 (DD prisoner complains that "the DDP are not helping" him).

109.    Dr. Leone's conclusions regarding the failure to provide required accommodations were borne out by other evidence in the case.  The testimony of several prison staff members demonstrated their ignorance of their obligation to provide reading

- 35 -

and writing support.  Gonzalez Dep. (Tr. Ex. 483) at 80:9-12 (ADA Coordinator at California Medical Facility [CMF] admitted he did nothing to ensure "that staff was providing reading and writing assistance"), 55:23-56:20 (did nothing to ensure the librarian was helping DD prisoners); Nies Dep. (Tr. Ex. 492) at 77:16-17, 77:24-78:15 (ADA Coordinator at Deuel Vocational Institution [DVI] testified his staff expects DD prisoners to go to other prisoners first and "are trained to provide that type of assistance [reading and writing sick call requests] if there's no one else available"); Mandeville Dep. (Tr. Ex. 485) at 109:25-110:11 (ADA Coordinator at CMF concerned that "the services are not being provided as intended" because she has heard that prisoners are going to other prisoners for assistance); Banks Dep. (Tr. Ex. 484) at 73:23-25 (DDP Officer at CMF admits that she does not "ever help with completing sick call requests").

110.   Testimony from plaintiff class members also established defendants' failure to provide the reading and writing support needed to allow these prisoners to participate as fully as non-disabled prisoners in prison programs, services, and activities.  See Davenport Dep. (Tr. Ex. 498) at 14:24-15:21, 23:16-24:5, 38:16-21 (request for assistance with laundry slip repeatedly ignored), 18:25-19:9 (explained to staff he could not read military time and was told to learn), 19:13-20:9 (requested assistance writing a grievance against a staff member and was referred to that staff member and "[n]othing came of it" so had to pay another prisoner to write grievance); Mendez Dep. (Tr. Ex. 480) at 13:21-25, 17:4-17 (asked for staff help with sick call slip and was told "you've got to find an inmate to do it"), 21:25-22:4 (told to find a prisoner to help him read and write letters), 22:21-23:2 ("quit asking" for help from DDP officer after trying three or four times without success), 33:22-35:12 (had to rely on other prisoners to read his disciplinary write-ups to him on three different occasions); Houseknecht at RT 1001:2-18 (needed help filling out complicated prison forms, but nobody offered to help him read or write); Wright Dep. (Tr. Ex. 496) at 77:6-25 (officers who deliver prison papers to him do not read them to him); Smith at RT 512:20-23, 513:2-4, 9-17, 513:25-514:15 (needs help filling out forms such

as grievances, canteen slips, and sick call requests but living unit officers have "refused to help [him] read and write"), 515:8-15 (DDP officer refused to help file a complaint against another staff member), 519:24-520:10 (has asked DDP Counselor Rhodes "for help many a times" but stopped because never receives help), 516:10-517:5 (has to pay other prisoners $5 to $7 in food and cosmetics to help him read and write canteen slips, sick call slips, and grievances because DDP officer "is never around"), 517:11-17 (has to wait until he has money to obtain help).  CDCR headquarters officials do not monitor sufficiently to ensure compliance with defendants' obligations.  Salz at RT 142:9-11, 17-20, 143:2-6, 9-13 (admits that he does not monitor—nor have personal knowledge of—whether DD prisoners are receiving assistance with reading and writing); Wells at RT 555:8-12 (does not know whether all DD prisoners receive needed help reading and writing).

<b>a.  Because of Defendants' Failure to Provide Required Reading and Writing Help, Plaintiff Class Members Are Forced to Pay Other Prisoners for Such Services, Which Exposes Them to Abuse</b>

111.    Because developmentally disabled prisoners do not receive staff assistance with reading and writing, they are forced to pay other prisoners for such services, which exposes them to abuse and exploitation.  See Subia at RT 248:14-249:2.  Dr. Leone found a widespread practice of prisoners using their canteen items, packages from home or parts of their meals to pay for reading and writing support from other prisoners.  Steven Ramirez (#153) had to give up his lunch in order to get another prisoner to write for him.  Leone Report at 13.  Trynon Jefferson (#78) gives other prisoners food and coffee for helping him with his grievances.  Id. at 12.  Curtis Brumfield (#149) has had to pay his cellmate with cookies for help writing documents.  Id. at 13.  Kuykendal Neirobi (#25) pays other prisoners with lunch food to file a grievance.  Id. at 14.  Prisoner #42 has to pay in soups to have someone write letters for him.  Id. at 11.  Prisoner #40 also pays in soups to have letters read and written.  Id. at 11-12.  Prisoner #41 pays other prisoners $2 to write letters home.  Id. at 6.  Latrill Wilkerson (#28) pays other prisoners to file

3eed1c1ae24c2125

grievances for him. <u>Id.</u> at 14. Celeste Jordan (#43) is regularly pressured to give up his canteen; his help mostly comes from other prisoners. <u>Id.</u> at 6. Rudy Lopez (#37), who cried during his interview with Dr. Leone, said he cannot read or write to file a grievance and is regularly forced to give up his canteen. <u>Id.</u> at 3 n.6. Evidence from the testifying class members substantiated Dr. Leone's findings. Mendez Dep. at 24:22-25:5, 44:10-21 (pays prisoners with items from his packages for reading and writing help; cost $40 to have grievance written); Davenport Dep. at 13:13-14:7 (pays other prisoners to help him); Petties Dep. (Tr. Ex. 495) at 13:18-15:16 (has to pay a prisoner to help him write). Dr. Salz, at CDCR headquarters, even acknowledges this practice. Salz at RT 117:19-22 (DD prisoners who need help reading and writing might have to pay another prisoner to help them).

112. It is dangerous for developmentally disabled prisoners to rely on other prisoners' assistance. Salz at RT 117:1-4. It creates a security risk if prisoners pay other prisoners for services because in a prison economy, if prisoners do not pay their debts, it can lead to violence. Subia at RT 248:14-49:2; <u>see also</u> Cowan Dep. (Tr. Ex. 494) at 121:16-22:17 (concerns about prisoners providing reading and writing assistance to other prisoners because it leads to "predatory behavior," disclosure of confidential information, and non-disabled prisoners "tak[ing] advantage").

**b.      Defendants' Failure to Provide Required Reading and Writing Help to Plaintiff Class Members Denies Them Access to Medical Care**

113. Without adequate support from defendants, plaintiff class members are denied access to necessary medical treatment. <u>See</u> Cowardin Report at 34. The process for obtaining medical treatment involves completing forms, describing problems, requesting treatment, and reading medication labels; developmentally disabled prisoners are "unlikely to know about or access such forms." <u>Id.</u> at 32-33. They generally need assistance reading, understanding, and completing these forms. <u>Id.</u>

114. To illustrate this problem, Dr. Leone pointed to the example of Mr.

1
2
3
4
5
6
7
8
9
10
11
12
13
14

Brumfield (#149), a diabetic, who "was afraid of losing his feet" because he was concerned about the length of time between receiving his meal and receiving his insulin. Leone at RT 770:12-15; 777:11-12; 777:17. "He hadn't seen a Doctor in awhile." Id. at 777:19. Mr. Brumfield is illiterate and "when he asks [officers] for help they tell him to ask his bunky or his cellmate." Id. at 777:7-9. But his cellmate told him, "I can't do your time and my time." Id. at 777:9-10; see also Tr. Ex. 4 at 2 (DD prisoner who has ongoing medical problems had medical procedure cancelled because he ate or drank water after midnight the evening before his scheduled medical procedure; he did not know not to do so); Leone at RT 752:10-753:9 (DD prisoner relied on cellmate to arrange appointment with the eye doctor; "he wasn't able to get assistance except through his cellmate, and so his cellmate was writing his request to see medical staff"); see also Tr. Ex. 423 (DD prisoner did not receive medical care for three-week-old injury because no assistance to write request).

15
16

### c. Defendants' Failure to Provide Required Reading and Writing Help to Plaintiff Class Members Deprives Them of Appropriate Access to Canteen Purchases

17
18
19
20
21
22
23
24
25
26
27
28

115.   Defendants' failure to help developmentally disabled prisoners fill out canteen forms forces "illiterate inmates to secure the help of others in order to complete the process," which puts them at "risk of exploitation and abuse by prisoners who take advantage of the situation." Cowardin Report at 22-23. Given their adaptive deficits, developmentally disabled prisoners face many difficulties in successfully completing the complicated canteen process, which requires a prisoner to fill out the appropriate form to withdraw money from his account, read and identify what items to purchase on a pre-printed form, calculate the total value of selected items and determine if it exceeds the amount in his account, find the canteen, deliver the form to the appropriate person or in-box, determine if he received all the items requested on the form, ensure the correct amount was deducted from his account, pick up the purchase, and transport it safely back to his housing unit. Id. at 23.

116.    Dr. Leone found that prisoners who cannot read or write are unable to participate in canteen.  Canteen problems were "widespread" in his prison tours, for all DDP designations.  Leone at RT 774:7-10.  Some developmentally disabled prisoners "have problems just filling out the request" for canteen.  Id. at 771:16-19; see also Smith at RT 516:10-517:5 (has to pay other prisoners from $5 to $7 in food and cosmetics to help him read and write canteen slips, sick call slips, and grievances because the DDP officer "is never around"); Blake Dep. (Tr. Ex. 497) at 81:10-83:19 (needs help filling out canteen forms.)  One plaintiff class member noted he was regularly pressured to surrender canteen items without recourse.  Leone Report at 3, n. 6 (Mr. Lopez (#37) was forced regularly to give up his canteen; he does not know how to read or write or file a grievance).

> **d.     Defendants' Failure to Provide Required Reading and Writing Help to Developmentally Disabled Prisoners Denies Them Access to the Prison Grievance System and the Courts**

117.    Defendants' failure to provide the support required to allow plaintiff class members to pursue grievances prevents them from meeting the exhaustion requirement necessary to achieve court redress.  See 42 U.S.C. § 1997e(a).  DDP staff is required to provide assistance that includes "completing any forms or documents necessary to secure any rights or benefits available to non-disabled inmates."  CRP at 8.  More specifically, developmentally disabled prisoners must have meaningful access to a law library.  Cf. Bounds v. Smith, 430 U.S. 817, 829 (1977).  As envisioned by the Plan, this requirement means that DDP staff at designated institutions must offer the following services:  (1) provision of forms and assistance in reading and "scribing" them; (2) identifying and providing research materials; (3) making an electronic or prisoner reader available; and (4) submission of forms/documentation to the court.  CRP at 47.  The form for initiating grievances for prisoners is called Form 602.

118.    Dr. Leone found that staff is not assisting prisoners with writing grievances. "[S]ome inmates indicated they did not know how [to] file [a] 602 because they couldn't

write.  Some inmates indicated that they had their 602's returned to them."  Leone at RT

819:12-17.  On one occasion, a developmentally disabled prisoner's form was returned

because he had not written it himself.  Id.  "[S]ome of them said . . . I file a 602 and I

never hear back about it, I don't know what happens."  Id. at RT 830:15-17.  Leroy

Hawkins (#133) was "told by [correctional officers] that it was not the job of the DD

[correctional officers] to write 602s (appeals) for inmates."  Leone Report at 12.

      119.   Dr. Leone also found that developmentally disabled prisoners are unable to

file grievances because prison staff members do not assist them with library services.

Leone at RT 819:18-22.  For example, Mr. Dupont's (#21) locker was broken into and he

lost most of his possessions.  Leone Report at 9.  The Victims Compensation and

Government Claims Board advised him that he could file suit for compensation, but

"when he tried to get assistance from" the Library Technical Assistant (LTA), she stated

"that she cannot help file lawsuits against the State."  Id.  Similarly, Michael Bell (#83)

reported that the LTA "told him that she can't write anything for him that goes out of the

institution."  Id. at 12; see also Tr. Ex. 4 at 3-4 (LTA Ibbotson "indicated that she was told

not to assist DD inmates with 602s" and the "lack of support for filing 602s was expressed

by several inmates who complained that they had no one to assist them if they did not

know an inmate who could help"), 2-3 (LTA said "she couldn't help [him] with a 602

while he was in the 'hole'"), 2 (Messrs. Wells, Mickiewicz, and West "reported that

officers were not available to help and that they relied on cellmates to read materials to

them . . . Several inmates who asked correctional officers or the library technician for

assistance reported being told to ask other inmates for help").

      120.   Testimony from plaintiff class members corroborated Dr. Leone's findings.

Daniel Mendez had to pay other prisoners to get help reading and writing grievances.

Mendez Dep. at 23:12-17; 24:19-21.  It cost him $40 to get a grievance written, which

was measured by the other prisoners by calculating the value of items from his packages

sent by his mother.  Id. at 23:15-24.  Twice he had to give up part of his package to pay

for grievances. Id. at 24:8-12. Brandon Petties filed a grievance for not getting enough yard time—it was written by other prisoners. Petties Dep. at 49:15-50:1. The grievance was denied and he was never told why. Id. at 50:6-25; see also Davenport Dep. at 19:13-20:9 (officer refused to help Mr. Davenport write a grievance and he had to pay another prisoner to write it); Smith at RT 515:8-15 (DDP officer refused to help him file a grievance).

121.    Prisoners who file grievances sometimes face retaliation from staff for doing so. See Leone at RT 828:3-20 (prisoner faced same-day retaliation by an officer who had given him a disciplinary write-up because the prisoner had filed a grievance appealing the disciplinary write-up and it was granted), 828:21-829:24 (another incident of retaliation against a prisoner who filed a grievance), 762:21-763:1 (prisoner filed a grievance against an officer and his possessions were subsequently "lost"; officer told him "[t]hat will teach you to file a 602"); Leone Report at 8-9.

### e.    The Evidence Clearly Shows that Defendants Fail to Provide Proactive Adaptive Support

122.    It is not disputed that defendants must be proactive in offering adaptive support to plaintiff class members. As Dr. Salz testified, "[i]t's essential for staff who are responsible for addressing the needs of developmentally disabled prisoners to be proactive." Salz at RT 122:2-4; see also Cowardin Report at 35-36. In Dr. Salz's words, "[c]orrectional officers have to offer help" to developmentally disabled prisoners "and not just respond to complaints" because "the other way would not be effective due to prison culture. But we have to be teaching them that we need to change the culture so that prisoners know that an officer will help. But they won't know that unless the officer tells them, 'I will help you.'" Salz at RT 122:6-13.

123.    However, the evidence reflects that defendants fail to proactively offer adaptive support assistance. See, e.g., Pearson at RT 372:12-14 (DDP officer does not ask DD prisoners if they need help with reading and writing, but waits for them to come to her); Banks Dep. at 16:25-17:21 (DDP officer states that if DD prisoners need assistance

with writing forms, they would come to her; she has not had a prisoner come to her);

Clausing Dep. (Tr. Ex. 491) at 96:12-98:5 (DDP officer never approached by some DD

prisoners to ask for help reading and writing, and he will not go to them and ask them if

they need help reading and writing, even if prisoner's Form 128C-2 indicates the prisoner

needs help),  101:16-106:9 (did not offer to write grievance for DD2 prisoner complaining

that his television was wrongfully taken by staff); Nies Dep. at 111:8-15 (ADA

Coordinator does not read or explain written orientation materials to DD prisoners).

### 2.   Defendants Systematically Fail to Provide Necessary Help with Self-Care

124.   Many plaintiff class members need help to remember to perform basic self-

care activities such as eating and cleaning themselves.  The evidence shoes that these

needs are not being met.

#### a.   Without Proper Accommodations Some Plaintiff Class Members Cannot Take Care of Themselves

125.   Dr. Leone found pervasive problems for plaintiff class members who were

unable to attend to their self-care needs without assistance.  See, e.g., Leone at RT 775:25-

776:10 (Mr. Anthony Roque (#139) forgot his utensils and was forced to eat with his

hands because staff would not let him back in the housing unit to retrieve his utensils), id.

at 754:14-755:2 (several prisoners wore the same clothes for a long period of time because

they never received their clothes back or did not understand what to do to get clean

clothes).

126.   In particular, class members are not receiving the assistance they require to

maintain their own personal hygiene.  Dr. Leone found that "[s]everal inmates I

interviewed had not bathed in some time; others were disheveled and dirty and clearly

needed assistance in meeting their daily needs."  Leone Report (Tr. Ex. 1) at 9; see also id.

at 17 (Mr. Rice (#154) was filthy, smelled, and staff had noted that he had "extremely

poor personal hygiene"), 7 (Mr. Houseknecht (#109) had not showered in more than a

week); Tr. Ex. 4. at 2 (three prisoners reported that officers were not available to help and

they had difficulty showering on a regular basis), id. ("[s]everal other inmates had significant hygiene issues that required attention"), id. (had not showered for three and a half weeks and did not have a towel.); Leone at RT 752:21-753:4 (Mr. Bradley (#55) smelled and had not showered recently; he was "pretty unkempt"); Tr. Ex. 444 (clinician observes over a three-month period that DD2 prisoner had "poor grooming – very long greasy hair and a shirt that is very dirty from his hair grease – over many weeks likely"); Tr. Exs. 428–429, 432–434, 438–439 (clinician notes over a ten-month period the "poor hygiene and grooming," "unkempt" appearance and "body odor" of DD2 prisoner who requires prompts and who "does not take showers as scheduled"); Tr. Ex. 243.

127.    Dr. Leone also found that defendants fail to provide necessary prompting and assistance to prisoners who require help with basic grooming.  Tr. Ex. 4 at 2-3 (prisoner's fingernails extended well beyond the end of his fingers and were curved and cracked; he had been in administrative segregation for roughly three months and had no way to cut his nails); Leone Report at 14 (prisoner reported that he has to pay $1 for a haircut; his hair was long and unkempt but he was waiting for two soups so he could afford to pay for a haircut).

128.    Testimony from plaintiff class members bolsters Dr. Leone's conclusions. Smith at RT 526:6-8, 526:13-20 (needs reminders to take showers and his cellmate or friends remind him because staff fails to do so; as often as three times a week he forgets to shower at all because nobody reminds him), 526:22-527:7 (needs reminders to do laundry but staff does not help him with this process; friend fills out his laundry slip); Davenport Dep. (Tr. Ex. 498) at 108:17-109:1, 18:13-22 (forgets "to shower . . . a lot;" officers do not prompt him to shower, his bunkie tells him when to shower), at 109:17-22 (forgets to go to meals three times a week); Houseknecht at RT 1032:17-21, 1033:4-14 and Tr. Ex. 261 (took only two or three showers in the two months that he was in administrative segregation and did not have a blanket for two months; CASE evaluation indicates that he has difficulty reading and telling time and that his cellmate cleans the cell and tells him

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

what to do); Tr. Ex. 303 (DD prisoner thinks he submitted laundry slip but has not received any clothing for five months); Mendez Dep. (Tr. Ex. 480) at 38:19-39:17 (sometimes forgets to take showers and his underarms smell; other prisoners told him to take a birdbath but staff did not remind him to take showers), 40:6-41:3 (staff did not tell him it was time to exchange laundry; had to pay another prisoner $15-20 a month to help him remember), 167:10-18 (staff at SATF and Wasco never reminded him to brush his teeth), 41:1-3 (another prisoner helped him get orthopedic shoes): Blake Dep. (Tr. Ex. 497) at 52:4-53:12 (needs prompting to remember to take medications; failed to take medicine because he forgot), 53:17-24,55:15-18 (at times, needs prompting to remember to take showers and do his job); Wright Dep. (Tr. Ex. 496) at 37:20-25 (staff never ask him if he needs help filling out laundry slips), 38:19-39:13 (other prisoners talk about his laundry when he has not changed his shirt in a few weeks but DDP officers do not remind him).

### b.    Prisoners Who Cannot Keep Themselves Clean Are at Risk of Harm

16
17
18
19
20

129.    Because staff fails to provide the necessary adaptive services, plaintiff class members are exposed to harm.  Developmentally disabled prisoners who cannot attend to their basic hygiene face negative consequences from other prisoners.  Salz at RT 113:18-114:8; see also id. at 113:1-5 (DD prisoner who needs prompting to complete self-care could suffer "serious consequences" if not prompted).

21
22
23
24
25
26
27
28

130.    Dr. Cowardin agreed, and explained further: "[i]n places such as prison, where people are confined in close quarters such as small cells and overcrowded dorms, proper hygiene can become a serious safety concern.  Prisoners with poor hygiene, regardless of the reason, can become the target of assault by others."  Cowardin Report at 29.  Dr. Leone further elaborated: "inmates who don't regularly bathe . . . become social pariahs," transmit disease, and "have all kinds of problems in a prison setting."  Leone at RT 751:4-8.  Prisoners who have trouble with self-care are identified as "potentially vulnerable," and some are harassed, and even attacked, for their vulnerability and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

unacceptable hygiene habits.   Leone at RT 751:4-10; Wright Dep. at 45:6-23 (had conflicts with former bunkie about the mess around his bed), 38:10-18 (bunkie confronted him about having dirty laundry and "smelling up the area"); Mendez Dep. at 39:5-10 (sometimes forgets to take showers and "inmates get mad" at him); Smith at RT 526:6-527:7, 527:21-528:11 (needs prompts to shower and do laundry and was attacked and beaten "for getting in the wrong shower").

### c.      Prison Staff Members Do Not Provide the Necessary Support

131.   Dr. Leone concluded that the serious deficits he saw and learned about were a result of failures on the part of prison staff.  Leone Report at 3 ("[a] number of inmates were dirty and unkempt suggesting that [correctional officers] were not prompting them to shower and change clothes regularly").  According to Dr. Leone, "the expectation is that trained correctional staff are tuned into and are able to respond to the kind of problems of daily living, the particular vulnerabilities, the inability of many of these inmates to read or to advocate for themselves" but, in "most cases," he did not find that staff was aware of these kinds of issues.  Leone at RT 755:3-16.  One reason that staff does not accommodate the needs of plaintiff class members is because "in many cases" developmentally disabled prisoners are "intimidated by staff and [don't] feel comfortable asking for assistance."  Id. at RT 753:16-19.

132.   The evidence supports Dr. Leone's opinion.  DDP officers do not monitor developmentally disabled prisoners' daily activities or maintain frequent contacts with them.  Banks Dep. (Tr. Ex. 484) at 32:20-35:12 (DDP Officer Banks at CMF:"I don't do nothing on a daily basis with the particular DD inmates"), 36:18-37:11 (does not prompt DD prisoners to shower, clean cells, change clothes, or brush teeth), 72:8-12 (does not prompt DD prisoners to attend meals), 72:13-15 (does not check if they are sending in laundry), 72:16-18 (does not inspect cells to see if they are clean), 64:5-7 (does not contact DD prisoners' work assignment supervisor), 83:13-16 (has never been told by a supervisor that she does not have enough contact with DD prisoners); Tr. Ex. 406 and

- 46 -

1
2

Clausing Dep. (Tr. Ex. 491) at 120:18-128:13 (log documenting that a DD2 prisoner who was incontinent was prompted to shower only once over the course of one month).

3
4
5
6
7
8
9
10
11

133.    At least one DDP counselor, by her own admission, fails to ensure that the required adaptive services are provided.  DDP Counselor Brown at CMF cannot recall helping developmentally disabled prisoners access health care and does not know what an Interdisciplinary Support Team (IDST) is and has never been a member of an IDST, even though Dr. Salz testified that the correctional counselor is a "mandatory member" of the IDST.[4]  Brown Dep. (Tr. Ex. 481) at 72:1-8, 132:4-13; Salz at RT 96:5-7; see also Brown Dep. at 34:17-35:6 (the only prompt she could remember giving was for prisoners to get clothes washed), 27:4-16 (the only characteristics of DD prisoners she could think of were cognitive issues).

12
13
14
15
16
17
18
19
20
21
22
23
24

134.    ADA Coordinators admitted to supervision so lax that they cannot be ensuring the reminders to perform basic self-care are provided.  Nies Dep. (Tr. Ex. 492) at 99:21-100:4 (ADA Coordinator at DVI does not know whether housing officers speak to DD prisoners on a daily basis); Gonzalez Dep. (Tr. Ex. 483) at 51:22-52:8 (ADA Coordinator at CMF does not know whether prompting to use yard took place; did not check to ensure); Ynson Dep. (Tr. Ex. 490) at 162:19-23 (does not know if there were any mechanisms in place to monitor compliance with CRP while he was an ADA Coordinator), 76:12-77:6 (ADA Coordinator at Lancaster believes "contact" is made if staff checks on class member and sees that he is asleep or finds that he is not in his cell), Prud'homme Dep. (Tr. Ex. 488) at 74:3-75:8; 79:11-16 (ADA Coordinator at SATF does not have an opinion as to whether a DD2 prisoner who urinates and defecates on himself should be prompted to shower, after reviewing evidence that an incontinent developmentally disabled prisoner was prompted to shower only once in a month).

25
26

135.    In sum, the Court agrees with Dr. Leone that plaintiff class members are not

27
28

---

[4] IDST is an interdisciplinary team of multiple staff members who "review and determine program needs of DDP inmates" to "ensure the provision of adaptive support services necessary for a DDP inmate to function at an acceptable level in the correctional environment."  Tr. Ex. 476 at 24.  The correctional officer must "participate in IDST" and "provide support services as directed by IDST." Id. at 42.

afforded the required adaptive support necessary, and as a result, are at unreasonable risk to their health and safety. Defendants clearly fail to monitor these prisoners and provide the necessary reminders for basic self-care. Although some prisoners received support and accommodations from staff, "the majority of these individuals are not receiving the accommodation, protection and support envisioned by the Clark Remedial Plan." Leone at RT 786:11-17.

### 3. Defendants Fail to Protect Plaintiff Class Members from Abuse.

#### a. Developmentally Disabled Prisoners Are More Vulnerable to Abuse Because of their Disabilities

136. Developmentally disabled prisoners' deficits in communication, information processing, and daily living skills, make them particularly susceptible to abuse. Leone at RT 748:24-749:15; see also Salz at RT 103:3-16 (DD prisoners "easily influenced by others"); Subia at RT 246:3-20 ("as a group DD prisoners are vulnerable," and "would be among the group of inmates that . . . are preyed upon by the more harsh and more hardcore predatory type inmates"); Horne Dep. (Tr. Ex. 482) at 35:20-36:5 (DD prisoners "at risk for victimization, being manipulated by other prisoners, or taken advantage of"); Valdez Dep. (Tr. Ex. 493) at 95:20-23 (DD prisoners can be "particularly vulnerable as compared to the entire prisoner population"); Cowardin at RT 625:3-13 (prisoners with mental retardation tend to be "very naïve, gullible, easy to trick or use, easy to exploit"); Cowardin at RT 632:7-634:2 (social isolation makes prisoners with autism vulnerable in prison setting). Accordingly, all CDCR staff should be trained to understand the abuse concerns unique to developmentally disabled prisoners. Wells at RT 193:18-194:2.

137. Because of their disabilities, plaintiff class members are subjected to verbal, physical, and sexual abuse and property loss through theft, coercion, and manipulation. While "some dedicated staff" work to ensure developmentally disabled prisoners' safety, far too many clearly do not. Leone Report at 19; see also Banks Dep. (Tr. Ex. 484) at 64:8-10 (admitting that she has not "provided services to a DD inmate because there was concern for his safety"). Some employees are ignorant of the reality that disabled

prisoners are more susceptible to abuse than the average non-developmentally disabled prisoner.  Gonzalez Dep. (Tr. Ex. 483) at 66:16-24; see also Banks Dep. at 82:6-9 (knows of no DD prisoners with abuse concerns); Brown Dep. (Tr. Ex. 486) at 25:11-26:3 (only characteristic of DD she could think of was reading and writing deficit).  Given this reality, Dr. Leone's conclusion that "the system as a whole appeared indifferent to the needs of these inmates" comes as little surprise.  Leone Report at 19.  Unless defendants ensure that dedicated employees are monitoring developmentally disabled prisoners and minimizing their contact with dangerous prisoners, developmentally disabled prisoners will continue to be abused and manipulated in the harsh, dangerous prison environment.

   **b.    Defendants Fail to Protect Plaintiff Class Members from Abuse by Other Prisoners**

   **(i)    Plaintiff Class Members Are Forced to Pay for Assistance from Other Prisoners**

138.    If prison staff members do not provide developmentally disabled prisoners with the reading and writing assistance that they need to avail themselves of prison services, or protection from abuse, they have little choice but to seek help from their fellow prisoners.  This "help," in most instances, does not come free.  Blake Dep. (Tr. Ex. 497) at 73:12-21 ("golden rule" of prisons is that prisoners charge for help).  In fact, developmentally disabled prisoners can be "manipulated" into paying "inordinate[ ] charge[s]" for help.  Prud'homme Dep. (Tr. Ex. 488) at 193:23-194:3.  Daniel Mendez, for example, paid another prisoner $40 in the form of eight jars of coffee to help him write a grievance.  Mendez Dep. (Tr. Ex. 480) at 44:20-24.  Moreover, by asking other prisoners to read and fill out their prison forms, prisoners requesting the help must often disclose personal information, leaving themselves open to exploitation.  Cowardin at RT 651:15-20; Cowardin Report at 24, 26-27; Salz at RT 118:7-11; Subia at RT 248:14-17.  Plaintiff class members have also had to pay other prisoners for protection.  Smith at RT 516:18-22 (pays other prisoners to take him to canteen).

   **(ii)    Plaintiff Class Members Routinely Surrender their Property to Other Prisoners**

139.   Dr. Leone concluded that property loss was the most chronic problem facing plaintiff class members.  Leone at RT 805:9-13.  His report documented approximately 24 incidents of reported property loss, and those were merely a representative sample of his findings.  Id. at 805:14-20; Leone Report at 6-9.  A "large number" of prisoners, for example, reported that they were forced or pressured to give up the items that they had purchased from the prison canteen "literally between the time that they . . . g[o]t the stuff [and] the time they g[o]t back to their unit."  Leone at RT 771:18-24.  He noted many examples in his report of prisoners who surrender their canteen to other prisoners.  Leone Report at 6-9.  As corroborated by a corrections officer, Mr. Gibson had more than $150 worth of canteen items stolen within a week's time.  Id. at 9.  Mr. Estrella (#58) and Mr. Thomas (#111) have their food taken by other prisoners.  Id. at 7-8.  Mr. Boyd (#54) "lends" his possessions to other prisoners, but they "always leave [the institution] before they pay him back."  Id. at 7; see also Tr. Ex. 443 (DD2 prisoner reports giving half of his property away "all the time"); Tr. Ex. 244 (DD2 prisoner gives away property to avoid abuse); Tr. Ex. 245 (staff observes DD2 prisoner being manipulated and intimidated and having property stolen by other prisoners).

140.   Testimony from prisoners corroborates Dr. Leone's conclusion.  See, e.g., Smith at RT 515:20-516:5; Davenport Dep. (Tr. Ex. 498) at 25:13-26:12, 30:17-32:11; Wright Dep. (Tr. Ex. 496) at 90:19-91:16.  Brandon Petties testified that other prisoners stole items off the cart that developmentally disabled prisoners were using to transport their canteen back to their living area.  Petties Dep. (Tr. Ex. 495) at 30:3-25.  He has also had food stolen out of his cell while he was getting his medication.  Id. at 28:1-9; see also Mendez Dep. at 42:9-12 (radio and food stolen from his cell after staff search when he was not present).  Other prisoners have seen personal items such as electric razors, coffeepots, hats, and sunglasses stolen from their fellow Clark class members.  Davenport Dep. at 134:3-14; Mendez Dep. at 46:3-14.  Developmentally disabled prisoners are also cheated out of their possessions in card games and dominos.  Petties Dep. at 32:12-22,

33:10-15.

141.    Defendants recognize that developmentally disabled prisoners are especially susceptible to losing their property through theft, coercion, and manipulation.  Salz at RT 75:11-16, 76:7-9, 84:5-12; Ynson Dep. (Tr. Ex. 490) at 34:3-25.  One ADA Coordinator asserted that corrections officers are "very good about" fulfilling their monitoring duties and "very observant" when it comes to issues of property loss.  Nies Dep. (Tr. Ex. 492) at 101:18-23, 102:4-5.  The evidence, however, demonstrates otherwise.  Banks Dep. at 62:7-63:12 (does not monitor the canteen activity of DD prisoners or inventory their property); Horne Dep. at 164:10-25 (will only escort prisoners to and from canteen if a problem is brought to his attention); Smith at RT 516:6-9 (officer told him he was a "big boy[]" and could go to canteen himself); Blake Dep. at 32:6-10 (is never escorted to and from canteen); Davenport Dep. at 27:18-28:5 (officers neglect to accompany DD prisoners to and from canteen about once a month); Leone Report at 7 (officers laughed at Mr. Houseknecht when he asked them to escort him to canteen).

142.    Staff members do not monitor developmentally disabled prisoners even when those prisoners' propensity to be abused is documented.  For example, Mr. Houseknecht, who is 6 feet, 2 inches tall, weighed 175 pounds in June 2009, but by November 2009, he weighed only 138-140 pounds.  Houseknecht at RT 1031:7-22, 1032:7-8.  He lost so much weight because his cellmate was stealing his food: "[A]fter a certain point, I had to give him most of my food."  Id. at 1031:25-1032:6.  Mr. Houseknecht's CASE evaluation, completed at R.J. Donovan in June 2009, indicates that he has the potential for abuse and that his canteen and personal property should be monitored to prevent loss to other prisoners.  Tr. Ex. 261; see also Tr. Ex. 430 (staff report that DD prisoner "gives away most of his canteen if not monitored).

143.    Staff members also neglect to help class members who ask for their help in recovering stolen property.  See, e.g., Houseknecht at RT 1036:24-1037:4; Davenport Dep. at 29:16-22; Mendez Dep. at 43:18-25; see also Leone Report at 7 (when prisoner's

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

mother complained about stolen property to Pearl Serna, <u>Clark</u> counselor at California
Rehabilitation Center, Serna said "this is to be expected when you live among thieves");
Wright Dep. 84:19-86:9 (asked for key lock because he cannot remember lock
combination and prisoners keep stealing his possessions; accommodation denied).

144.    In this climate of indifference, developmentally disabled prisoners are
forced to surrender their items to whoever asks, cajoles, threatens, or strong-arms them, or
to protect their property with physical force.  Those that choose the latter option risk
disciplinary violations that can lengthen their sentences.  <u>See, e.g.</u>, Davenport Dep. at
44:14-20 (received disciplinary write-up for fighting to keep his canteen); Leone Report at
10 (Prisoner #148 reported same).

**(iii)    Plaintiff Class Members Are Subjected to Physical
and Sexual Assaults by Other Prisoners**

145.    Dr. Leone concluded that many plaintiff class members had suffered
physical and sexual assaults, but that staff did not take seriously the risk of harm to the
developmentally disabled prisoners and did not provide them with adequate protection.
Leone at RT 750:11-19.  The prisoners that he interviewed were "chronically threatened
and beaten up[,] often when they attempted to prevent their property from being taken.
Several prisoners reported that they had been raped or that another inmate had attempted
to rape them."  Leone Report at 4.  After telling prison staff members that he was afraid of
being attacked, Mr. Thomas (#62) was assaulted on the yard.  <u>Id.</u> at 10; Leone at RT
749:16-750:10.  Prisoner #136, who had been raped by gang members in another prison
three years before, was choked by another prisoner who wanted sex.  Leone Report at 10.
Prisoner #108 was raped twice while living at Lancaster.  <u>Id.</u>  In addition to these
documented incidents, Dr. Leone heard other, similar stories from <u>Clark</u> class members.
Leone at RT 750:17-19.

146.    Prisoners' testimony and the documentary record are replete with reports of
physical and sexual abuse suffered by developmentally disabled prisoners.  <u>See, e.g.</u>,
Houseknecht at RT 1017:21-1020:25 (cellmate punched him repeatedly and raped him),

id. at 1004:10-15 (cellmate tried to stab him in the eye), id. at 1008:15-1010:18 (cellmate constantly slapped, punched and choked him), id. at 1035:13-1036:13 (another prisoner engaged in "aggressive negotiation" by putting him in headlock to get canteen items); Smith at RT 515:24-516:5 ("choked [ ] out" for his canteen), 527:21-528:11 (beaten up for being a "slow learner," using the wrong shower), 528:14-23 (prisoners made him do exercise as punishment for being in wrong area); Mendez Dep. at 46:15-48:21 (prisoners rushed him on toilet because they thought he told officers about canteen theft); Petties Dep. at 27:16-24 (other prisoner beat him after he would not give up his food); Tr. Ex. 424 (DD prisoner requests stay in crisis bed after cellmate "made [him] do things to him" and kept him in the cell for 9-11 days); Tr. Exs. 233, 249, 253-54, 264, 343, 362, 366, 376, 380-81, 389, 392-393.

147.    One developmentally disabled prisoner was issued a disciplinary write-up due to his concerns for his safety. Tr. Ex. 101 (despite "realistic fears" for his safety noted by the Mental Health clinician, DD prisoner found guilty of "Obstructing a Peace Officer in the Performance of Their Duty" for refusing a cellmate).

### c.    Staff Abuse Prevents Plaintiff Class Members from Obtaining Meaningful Access to Prison Programs, Services, and Activities

148.    It is important for corrections staff to build relationships with developmentally disabled prisoners so that the prisoners ask staff members for assistance and protection.  Prud'homme Dep. at 197:15-19; Valdez Dep. at 104:18-105:3; see also Salz at RT 122:10-11 ("[W]e need to change the culture so that inmates know that an officer will help").  If prisoners fear, or feel demeaned by, custody staff, they are far less likely to approach officers, counselors, or clinicians for help.  Leone at RT 763:18-764:12, 801:24-802:6; see also Chapa Dep. (Tr. Ex. 489) at 139:5-24 (DD prisoners might not ask for help if they are scared or reluctant to talk to staff).  In some cases, staff abuse serves to prevent prisoners from fulfilling their own needs.  Smith at RT 523:6-12 (sometimes he will not leave his cell to retrieve his medicine for fear of getting harassed by staff).

1
2
3

Moreover, when staff mocks developmentally disabled prisoners, "it's indicative of the indifference towards and understanding the consequences of ignoring or neglecting the inmates' needs."  Leone at RT 764:8-12.

4
5

        **d.**      **Defendants Fail to Address Abuse that Prisoners and Staff Inflict on Plaintiff Class Members**

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

     149.   In the past two years, defendants have received multiple reports that expressed concerns regarding the abuse of developmentally disabled prisoners, including Dr. Leone's February 2010 expert report (Tr. Ex. 1), Dr. Leone's July 2008 Lancaster report (Tr. Ex. 4), and the Prison Law Office's November 2008 Lancaster monitoring report (Tr. Ex. 1003).  Salz at RT 139:6-139:11; Subia at RT 238:21-238:25; Wofford at RT 403:14-407:12.  However, defendants did little, if anything, to address the abuse issues raised therein.  Subia at RT 252:11-16 (no corrective action taken in response to 2010 Leone report); McDonald at RT 967:2-12 (has not taken action in response to 2010 Leone report; is not aware of any responsive action defendants have taken); Wells at RT 470:1-16 (neither directed staff to take corrective action, nor asked Subia to direct Lancaster warden to take corrective action, in response to 2008 Leone report); Rhodes Dep. (Tr. Ex. 487) at 85:24-86:2 (not aware of any changes to DDP at Lancaster as a result of 2008 Leone report); Wofford at RT 420:6-10; 421:11-16 (did not investigate incidents cited in Prison Law Office's 2008 Lancaster report, and is not aware of any corrective action being taken).

21
22
23
24
25
26
27
28

     150.   Furthermore, procedures designed to protect <u>Clark</u> class members are routinely ignored.  <u>See, e.g.</u>, Wofford at RT 436:23-437:4 (interviewing potential cellmates of DD prisoners would "reduce the risk of victimization" of DD prisoners by their cellmates), 438:19-439:8 (CRP requires that correctional staff interview potential cellmates of DD prisoners prior to housing them together), 438:19-439:8 (cellmates of DD prisoners only interviewed "on occasion"); Gonzalez Dep. at 66:25-67:10 (would be "tunnel vision" for DDP officers to monitor DD prisoners), 87:22-88:10 (DD prisoners live within general population and not specialized DDP units); Banks Dep. at 64:8-10

(admitting that she has never "provided services to a DD prisoner because there was concern for his safety").

151.    CDCR officials claim to be particularly concerned about incidents of staff abuse and harassment of developmentally disabled prisoners.  Subia at RT 253:9-13 (staff harassment "really concerns me" and, of all the incidents documented in Dr. Leone's 2010 report, "those are the ones that are most important to me"); Scaramozzino at RT 916:1-25 (conduct of Officer Jones is a "real issue[ ] that need[s] attention" and "not defensible"; if CDCR does not review accusations, "we have a problem").  As of the evidentiary hearing, however, nobody at CDCR had investigated, let alone taken action to rectify, the staff abuse issues raised in Dr. Leone's 2010 report.  Subia at RT 253:14-16; Scaramozzino at RT 915:11-12, 916:20-22, 917:5-8; McDonald at RT 967:2-12; see also Ynson Dep. at 161:7-10 (no reaction to Leone report).  While Defendants did belatedly endeavor to investigate Dr. Leone's conclusions, it was only upon learning that this Court was concerned by their failure to respond.

**4.      Defendants Systemically Fail to Provide Accommodations Required to Assist Developmentally Disabled Prisoners in Conforming with CDCR Rules and Regulations**

**a.      Defendants Fail to Provide Effective Communication in Proceedings that Implicate Plaintiff Class Members' Due Process Rights**

**(i)      Required Accommodations**

152.    Defendants are legally obligated to ensure that plaintiff class members are afforded appropriate accommodations in disciplinary, classification, and administrative segregation hearings to allow them to understand the proceedings.  See supra § I.C.1.  To meet these obligations, CDCR policy requires that all developmentally disabled prisoners "must be assigned" staff assistants in connection with such proceedings.  Wells at RT 472:8-14; Salz at RT 141:22-142:8.  This requirement, as embodied in the Clark Remedial Plan, imposes certain obligations on the staff assistant, including (1) informing the

prisoner of his or her rights and ensuring that the prisoner understands the proceeding to the best of his or her ability; (2) helping the prisoner prepare for the hearing; (3) representing the prisoner's position at the hearing; (4) ensuring that the prisoner's position is understood; (5) ensuring the prisoner understands, to the best of his ability, the decision reached; (6) providing the hearing official with information related to the prisoner's developmental disability and adaptive support services required; (7) being present at a disciplinary hearing and all interviews related to the hearing; and (8) not giving legal counsel or specifying the position the prisoner should take.  CRP at 49-50.

153.   To ensure understanding at due process hearings, the assigned staff and other participants in the hearing must affirmatively ask the developmentally disabled prisoner regarding his or her comprehension. Salz at RT 120:13-16, 121:1-4.  A preferred method to accomplish this requirement is to ask the prisoner to repeat the information back in his or her own words.  See, e.g., Subia at RT 244:19-24; see also Cowardin at RT 629:2-630:1.

154.   For disciplinary hearings, the Clark Remedial Plan requires that a clinician review the disciplinary write-up (Form CDCR 115) after the hearing but before the disposition becomes final.  CRP at 50; Salz at RT 156:4-11; Wells at RT 496:25-497:3; 497:19-498:2. The purpose of this review is to ensure that the disposition is appropriate in light of the prisoner's disability.  Wells at RT 497:4-11.  This review is to be noted on the form.  Id. at RT 496:25-497:6.

155.   Similarly, for administrative segregation hearings, the provision of a staff assistant must be noted on the appropriate form, a Form CDCR 114D.  Id. at 472:8-17.  A staff assistant is required to ensure that developmentally disabled prisoners understand the reason for their placement in administrative segregation.  Id. at 473:23-474:4.

### (ii)   Required Accommodations Are Not Provided.

156.   Defendants systemically fail to satisfy their obligation to ensure that prisoners engaged in disciplinary, administrative segregation, and classification hearings

1
2
3
4
5
6
7
8
9
10

understand those proceeding.  The evidence shows that defendants repeatedly default on their obligation to provide staff assistants at disciplinary hearings.  See Tr. Exs. 104, 106-10, 137-39, 158, 174-75, 180, 190, 201, 411, 419 (all reflecting that no staff assistant provided).  Sometimes developmentally disabled prisoners were left to file grievances to try to obtain required support.  See, e.g., Tr. Exs. 353, 354.  Defendants also fail repeatedly to consult with clinicians before final disposition of a prisoner's disciplinary write-up.  See Tr. Exs. 101-03, 105-06, 109-10, 113-14, 116-31, 133-37, 140, 142-43, 145-69, 171-78, 182-90, 192-200, 202-03, 205-20, 223-25 and 409-22; see also Tr. Ex. 463 (no Clark clinician review performed in nearly 24% of hearings for disciplinary hearing documents produced by defendants).

11
12
13
14
15
16
17
18

157.    Defendants also fail to provide staff assistants consistently at classification hearings, hindering the ability of developmentally disabled prisoners to fully participate in the classification process.  See Tr. Exs. 273, 278-85, 287-90, 292-95 and 355-57.  Likewise, many plaintiff class members were placed in administrative segregation without receiving required staff assistance.  See Tr. Exs. 287-88, 306-07, 321, 331, 333, 335, 337-39, 341, 350, 364-75, 377-82, 392, 393; Wells at RT 475:10-12, 483:7-17; see also Wells at RT 483:7-484:17; Tr. Ex. 307 (illiterate DD prisoner not given staff assistant at administrative segregation review); Tr. Exs. 306, 338, 373.

19
20
21
22
23
24
25
26
27
28

158.    Evidence from staff at the prisons confirmed these problems.  See, e.g., Mandeville Dep. (Tr. Ex. 485) at 159:5-10.  Gene Nies, the former ADA Coordinator at DVI, conceded that defendants "need to figure out a better mechanism to ensure that . . . staff assistant should be assigned at the time of the [administrative segregation] hearing."  Nies Dep. (Tr. Ex. 492) at 162:16-163:3.  At SATF, ADA Coordinator Prud'homme admitted he does not review 114D forms.  Prud'homme Dep. (Tr. Ex. 488) at 142:10-11.  He also admitted that various exhibits he saw did not reflect that a staff assistant had been provided during an administrative segregation hearing.  Id. at 147:8-149:18, Tr. Exs. 339, 341.  At Lancaster, Mr. Ynson admitted that when he was ADA Coordinator, he did not

know if staff assistants were provided during administrative segregation reviews with prisoners, nor did he even know if it was required.  Ynson Dep. (Tr. Ex. 490) at 123:25-124:7.

159.    As these failures suggest, defendants are not fulfilling their obligation to ensure that plaintiff class members understand these critical proceedings.  Even when staff assistants are provided, there is no systemic effort to ensure the prisoners are receiving meaningful support that provides them with a real understanding of the proceedings.  See Tr. Ex. 227 (defendants determined DD1 prisoner understood and agreed with a classification committee's decision, even though prisoner "became agitated and frustrated and refused to acknowledge any statements or questions generated by the members"); Tr. Ex. 232 (effective communication achieved at DD3 prisoner's classification hearing by having the staff assistant "speak[] loudly and repeat[] statements and/or questions"; prisoner is unable to speak according to medical report, but "appeared to understand by looking at [the staff assistant] each time he was asked a question and [the staff assistant] repeating the question in a loud clear voice within close proximity to [the inmate]. Once [the staff assistant] repeated the question/statement, [the inmate] would return to looking at the committee");  Banks Dep. (Tr. Ex. 484), 46:5-12 (DDP officer from CMF testified that as a staff assistant, she writes down if the DD prisoner wants to call witnesses, but otherwise "I walk away" if the prisoner does not have questions), 47:5-15 (when acting as a staff assistant, she explains the hearing to the DD prisoners, but does not ask the prisoner questions to make sure he is understanding because "if he doesn't understand, he'll tell me"), 51:14-24 (believes the burden is on the DD prisoner to ask questions if he does not understand),  49:15-20 (does not help DD prisoners with forms for disciplinary hearings and could not recall if she had ever provided additional explanations); see also Defendants' Witness List for Case in Chief (Dkt # 366-1 at 6) (reflecting that Banks is DDP officer).

160.    Staff members are not well informed about their role as staff assistants and

1
2
3
4
5

oversight is inadequate.  Brown Dep. (Tr. Ex. 486) at 76:8-15 (at CMF, DD counselor could not recall receiving staff assistant training); Nies Dep. at 139:15-140:22, 140:24-141:6 (same at DVI); Ynson Dep. at 121:24-122:17 (ADA Coordinator at Lancaster has no personal knowledge of whether staff assistants are provided during disciplinary hearings).

6
7
8
9
10
11

     161.   The same problems exist with respect to classification hearings.  <u>See</u> Prud'homme Dep. at 139:21-140:22, 198:15-199:1 (ADA coordinator at SATF admitted he does not have personal knowledge that DD prisoners receive staff assistants in classification hearings); Ynson Dep. at 114:21-24 (ADA coordinator at Lancaster in 2009 had no personal knowledge whether staff assistants were assigned during all classification meetings).

12
13
14
15
16
17
18
19
20
21
22

     162.   As a result, plaintiff class members are not obtaining the adaptive supports they require at such hearings.  <u>See, e.g.</u>, Leone at RT 756:3-6 (some DD prisoners had "no idea" why they were in administrative segregation and when Leone asked them a series of questions to verify this, "some of them just didn't have an idea"); Blake Dep. (Tr. Ex. 497) at 69:25-70:17 (staff assistant failed to tell him what was going to happen at a disciplinary hearing, failed to explain the charges and failed to explain potential punishments), 147:6-14 (although he understood he was being punished for tattoo, he also explained in deposition that he was talked into it by another prisoner "saying it's cool, it's the right thing to do" and that no one had told him it was against the rules; there was no evidence staff assistant explained this at the hearing or that punishment was assessed in light of relevant issues relating to his disability); Tr. Ex. 269.

23
24
25
26

     163.   This evidence, taken together, establishes that defendants fail to provide the required support to ensure that effective communication is provided for developmentally disabled prisoners at disciplinary, administrative segregation, and classification hearings. <u>See</u> Leone at RT 792:1-793:12.

27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### b.   Defendants Fail to Provide Effective Communication of the Rules with which Developmentally Disabled Prisoners Are Required to Comply

164.   Defendants have an obligation to ensure that their communications with developmentally disabled prisoners are "as effective" as their communications with non-developmentally disabled prisoners.  See *supra* § I.D.3  To facilitate these communications, the Clark Remedial Plan contemplates that staff will monitor developmentally disabled prisoners and provide them with "direct instructions, prompting, verbal counseling," to assist them in complying with prison rules and regulations.  CRP at 49.  The Remedial Plan also requires that employees "ensure the inmate understands (to the best of his/her ability) the consequences of continued misconduct."  Id.

165.   If misconduct continues, staff can invoke formal discipline, but in doing so, "[t]he staff member observing the misconduct must take into consideration the severity of the inmate's disability and the inmate's need for adaptive support services when determining the method of discipline."  Id.; see also Wells at RT 493:2-13.

166.   Contrary to this policy, many plaintiff class members receive disciplinary write-ups for behavior "they should have been counseled about" or things that "easily could have been prevented."  Leone at RT 765:16-766:2, 770:5-8 ("[i]f staff are aware [who's] DD on the unit, if they look at those chronos periodically, they should be able to anticipate potential problems inmates might have and be able to do things to prevent [rules violation reports] or 115's"); see Tr. Ex. 101 (DD prisoner assessed 90 days of credit forfeiture for "Obstructing a Peace Officer in the Performance of Duty" for refusing a cellmate; clinician notes that the prisoner "reports realistic fears for his safety"); Tr. Ex. 103 (DD prisoner who "does not read, write, or understand English," found guilty and assessed 30 days of lost credits for "Disobeying Orders" for refusing to sign his Notice and Conditions of Parole form); Tr. Ex. 409 (DD prisoner receives a 30 day loss of credit and a 10 day loss of yard for "Disruptive Behavior" for refusing to return to his cell until he spoke to a sergeant; clinician indicates that he was not "trying to be difficult; he just

had a fixed idea which he was trying to complete in a rigid manner (DD1)").  Other disciplinary write-ups for plaintiff class members raise similar concerns.  See, e.g., Tr. Exs. 102, 127 (failure to provide a random urinalysis); Tr. Exs. 112, 116, 124, 136, 138, 142 (out of bounds); Tr. Exs. 106, 107, 114, 115, 118–21, 123, 128, (failure to report or unexcused absence or refusing to work); Tr. Ex. 139 (failure to report to pill line); Tr. Exs. 104, 108, 110, 111, 117, 131, 132, 137, 140-41, 143, 144 (disobeying direct order); Tr. Ex. 145 (refusing a cellmate); Tr. Exs. 126, 130, 133 (delaying a peace officer);Tr. Ex. 135 (refusal to stand for count); Tr. Exs. 100, 125 (failure to comply with cell cleaning and other standards).

167.    When a developmentally disabled prisoner is repeatedly written up for rules violations attributable to his disability, defendants' conduct is "absolutely not" in compliance with the Clark Remedial Plan and the level of support provided to the prisoners is "totally inadequate."  Leone at RT 768:9-11.  Dr. Leone found repeated examples of these violations of the Clark Remedial Plan where it was "hard" to "understand" because staff could have intervened to avoid the disciplinary write-ups.  Id. at 768:19-769:10 (DD prisoner written up for "being in the wrong place at the wrong time" when he tried to use the phone at the time he had been told in his previous unit to use it); Tr. Ex. 11; see also Cowardin at RT 623:4-24:3 (discussing difficulties DD prisoners can have when changing settings); Leone at RT 765:16-766:2; 769:11-23.

168.    In disciplinary hearings, defendants fail to account for durability deficits unique to developmentally disabled inmates, as noted in § I.F.1, *supra*.  Defendants do not recognize that a single prompt, or even a few, may be insufficient for a developmentally disabled prisoner, and he or she may need constant daily reminders to participate in prison activities, services, and programs. See, e.g., Tr. Exs. 139 (DD prisoner found guilty of failure to report to pill line when only informed via public address system, with no reference to prompts, reminders, or warnings), 125 (DD prisoner found guilty of hanging a sheet in his cell after only one group notification of rules regarding cell maintenance,

with no reference to prompts, reminders, or warnings).

### D. Defendants' Current Remedial Efforts Are Insufficient

169.   Defendants have taken some steps towards addressing the unlawful conditions suffered by the plaintiff class.  These steps, including those taken in the areas of staffing, housing, training and self-monitoring, have fallen gravely short of the measures that must be taken to create conditions that satisfy the constitutional and statutory mandates set forth above.  See supra, § I.C.

#### 1. Staffing

170.   Defendants have designated some staff members specifically to work with developmentally disabled prisoners.  However, the staffing is not adequate to provide the necessary accommodations to class members for a variety of reasons, including defendants' failure to screen staff members for their ability to work with a population that requires special skills and strengths, their failure to operate a program that addresses the disabled prisoners' needs proactively, and their failure to allocate staff members reasonably.  Because of these staffing inadequacies, prisoners with developmental disabilities continue to face discrimination, denial of access to programs and services, denial of due process rights, and dangerous and unconstitutional living conditions.  The Court expert identified staffing as an issue that must be addressed before defendants can provide adequate services.  See Leone at RT 792:1-13.

171.   The staff members who are assigned to the DD program often lack the skills to provide services to this population.  Although Dr. Leone identified a few officers who appeared to understand their responsibilities to the class members, others "regularly made fun of [the prisoners'] inability to read or write, refused to assist them and failed to notify designated DD officers or threatened them.  A large number of prisoners said they feared retaliation from correctional officers and tried to avoid specific officers."  Leone Report at 4.  Not surprisingly, DDP staff members often fail to develop a rapport with developmentally disabled prisoners.  Horne Dep. (Tr. Ex. 482) at 106:6-21.  Rather than

looking to staff members for assistance, prisoners fear them.  Leone Report at 3.

172.    The current DDP staff also lacks basic knowledge about the group assigned to the program.  Some staff members hold the "erroneous belief that inmates who can read and write are not developmentally disabled."  Leone Report at 6.  Some inappropriately question the disability status of certain class members.  *Id*.  Others are likely misled by prisoners' DD1 classifications to believe that the prisoner does not require assistance. Cowardin at RT 655:13-656:4.

### 2.    Training

173.    It is undisputed that defendants provide training to their staff regarding developmentally disabled prisoners and the accommodations that they require.  The serious problems set forth herein show that the training "is either inadequate or . . . there is insufficient attention paid by administrative staff to the safety and protection of inmates with DD."  Leone Report at 4.  The DD training is clearly not sufficient, which constitutes a "serious issue." Leone at RT 792:14-20; see also id. at 788:12-25; Leone Report at 4; Cowardin at RT 654:25-655:3.

174.    Not all staff members are properly trained.  Salz at RT 131:21-132:2 (staff has used improper training materials in the field); see also Subia at RT 231:11-16 (challenge to make sure staff members are properly trained); Prud'homme Dep. at 130:18-23, 131:13-16 (staff member responsible for training did not know whether appropriate staff had received necessary training).

175.    Some prison staff members assigned to work with developmentally disabled prisoners lacked training on some of their duties under the Clark Remedial Plan.  Pearson at RT 369:8-17, 369:18-371:20, 371:21-372:7 (admitted no training on how to fill out adaptive support activity logs, how to elicit abuse concerns from prisoners, or how to communicate with DD prisoners); Brown Dep. at 82:20-25, 83:10-18, 112:25-113:7 (DDP counselor recalls no training on being staff assistant, serving on classification committees, or achieving effective communication with DD prisoners);  Horne Dep. at 92:21-93:10

1

2   (DDP officer received no training on completing adaptive support logs).

3        176.   Other prison staff members demonstrated a lack of adequate training on

4   critical <u>Clark</u> issues.  Banks Dep. at 14:4-15:1, 15:24-16:1 (DDP officer is familiar with

5   parts of the CRP, but cannot identify which ones, and has never heard of prison's

6   operational procedure implementing CRP);  Chapa Dep. at 131:11-21 (<u>Clark</u> counselor

7   with nine years experience unaware of obligation to log adaptive support contacts until

8   very recently), 239:10-16 (not familiar with characteristics, symptoms of autism).

9        177.   Simply providing training on the DD program, without overseeing and

10  analyzing the outcomes, is not adequate to implement the Clark Remedial Plan.  Leone at

11  RT 789:6-22.  Defendants have not evaluated the effectiveness of their training.  <u>E.g.</u>,

12  Subia at RT  243:1-6 (has neither performed nor reviewed any analysis to determine

13  training's effectiveness).

### 3.   Self-Monitoring

14        178.   The Court finds that defendants are not capable of systematically identifying

15  and correcting compliance problems with federal law and the Clark Remedial Plan.

16        179.   The Court expert testified that defendants do not have the capacity or the

17  will to monitor themselves.[5]  Based on his experience working with prison systems where

18  court supervision came to an end, Dr. Leone believes that defendants are not in a position

19  to exit from Court supervision in <u>Clark</u>.  Leone at RT 798:17-799:9.  Further, Dr. Leone

20  testified that even if defendants could identify problems through an audit, it is doubtful

21  that they have the will and desire to remedy any issues they identify and provide adequate

22  accommodations to developmentally disabled prisoners.  <u>Id.</u> at 845:10-14, 727:12-19.

23

24        [5] Many of the remedial measures defendants have presented in this hearing came
about through court orders in other prison reform cases.  The Office of Court Compliance
25  staff at the individual prisons who act as headquarters' "eyes and ears" are a result of
court intervention in <u>Armstrong</u>.  Wells at RT 445:25-446:3.  The auditing tool and
26  accountability system defendants have committed to implement in this case were a result
of another <u>Armstrong</u> order.  McDonald at RT 936:14-937:6, 962:18-20.  The Bureau of
27  Independent Review, an essential part of defendants' disciplinary system, was a result of a
court order in <u>Madrid v. Terhune</u>, No. 90-3094 TEH (N.D. Cal.), which "revamped" the
28  CDCR disciplinary system.  McDonald at RT 963:10-14, 964:25-965:3, 965:9-11.

1
2

**a.    Defendants Cannot Identify and Correct Violations of Federal Law and the Remedial Plan through their Own Monitoring**

3    180.    Given the size and complexity of CDCR as already noted, immediate

4  universal compliance with the Clark Remedial Plan is not possible.  As a result, a system

5  to identify and correct problems is critical.  Without such a system in place, defendants

6  cannot ensure that the requirements of federal law as embodied in the Clark Remedial

7  Plan will be institutionalized.  Leone at RT 783:22-784:11; Wells at RT 453:20-454:12

8  (audits and establishing baseline are necessary to measure progress of compliance with

9  policies); Salz at RT 132:11-14 (headquarters oversight is crucial to make sure that

10  policies and procedures are actually being followed); see also § III.C, *infra*.  Rather, one

11  would expect to see what the evidence actually demonstrates–a system characterized by

12  generalized indifference, with isolated examples of compliance from a few committed

13  individuals.  Leone at RT 727:12-728:9.

14    181.    A uniform, standardized audit tool to conduct annual compliance reviews is

15  required by the Clark Remedial Plan, first adopted by the parties in 2001 (Dkt # 194).

16  CRP at 62.  The required audit tool should contain a standard set of inquiries that will, at a

17  minimum, monitor classification, grievances, disciplinary processes, prisoner

18  assignments, and provision of required services.  Id.  Before the implementation of

19  compliance reviews, plaintiffs' counsel must have an opportunity to review the audit

20  instrument that CDCR has developed.  Id.

21    182.    Defendants do not have a standardized audit instrument currently in place.

22  Subia at RT 264:6-13[6]; McDonald at RT 951:23-952:4.

23    183.    Approximately one and a half years ago, seven years after they were

24  required to start annual audits, defendants began to develop a draft audit tool.  It remains

25  incomplete and is not ready for use.  McDonald at RT 939:9-21, 951:23-952:7; 952:17-

26  954:9 (audit tool is incomplete and McDonald does not know details about tool).

27
28
_____
[6] A single compliance review was conducted eight years ago.  No evidence was presented that it was conducted using a standardized audit instrument vetted by plaintiffs' counsel, as required by the Remedial Plan.  Wells at RT 456:20-22.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

184.    In its current form, the draft audit tool is bereft of many important areas of inquiry.  Id. at 952:17-954:9, 953:5-23 (no questions in the tool for DD prisoners about whether they are physically assaulted); 954:10-13 (no questions in the tool for DD prisoners about whether they are sexually assaulted), 954:14-17 (no questions in the tool for DD prisoners about whether staff members speak confidentially with them), 954:22-25 (no questions in the tool for DD prisoners about whether they must pay other prisoners for help reading and writing prison forms), 956:3-10 (no questions in the tool for DD prisoners about whether they are verbally abused by staff members or other prisoners), 957:12-20 (no questions in the tool about whether DD prisoners receive prompts to perform daily living functions).  These deficits contrast markedly with the Court expert's recommendations that an audit instrument query DD prisoners about their treatment. Leone at RT 791:12-25.

185.    Moreover, Ms. McDonald did not know if the tool in its current form measures whether DD prisoners are being properly identified.  McDonald at RT 957:21-25.  The audit tool also does not evaluate compliance efforts at the headquarters level. McDonald at RT 952:8-13.

186.    Defendants became aware of these and other significant omissions in the tool only when raised while they were being cross-examined at trial.  Id. at 976:15-977:3, 952:11-953:22, 954:1-955:2, 956:3-10, 957:12-25.

187.    Although many shortcomings were apparent from defendants' own testimony, the Court is unable to fully assess the adequacy of the tool because it lacks the benefit of plaintiffs' counsel's expertise and input because defendants have not asked plaintiffs' counsel to vet the draft tool.  Wells at RT 205:21-206:16, 977:7-19.  Input from plaintiffs' counsel has been useful in this case in the past.  Wells at RT 449:13-16; CRP at 62; Salz at RT 56:7-58:15 (to date, there has been "tremendous" cooperation between plaintiffs' counsel and CDCR to improve the DDP, with great success).

188.    At the time of the hearing, defendants claimed that the tool would be ready

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

for use in 30 days.  McDonald at RT 933:16-18.  Since the instrument is not finished, however, and since defendants only recently learned of deficits from plaintiffs' counsel during trial, the Court cannot find that it will do what it is intended to do–provide an accurate measure of compliance.  Wells at RT 977:20-978:24 (the decision about whether and when to show the completed audit tool to plaintiffs' counsel must be made by the Office of Court Compliance management team, the Office of Legal Affairs management team, and the Division of Adult Institutions, and there has been no "in-depth" discussion of the time frame for this).

189.   In the absence of the required standardized audit process, defendants have relied on informal communications regarding compliance at the prisons.  The evidence shows that these efforts have been piecemeal and fall short of what is required to identify and correct violations of federal law and the Clark Remedial Plan.  Wells at RT 455:15-456:7.

190.   Dr. Salz, the Chief Psychologist at CDCR who directs the mental health component of the Clark remedial efforts, conducts limited reviews of discrete areas of the Clark Remedial Plan: he checks only on the testing and identification of developmentally disabled prisoners.  Salz at RT 136:14-17.  In the last two years, Dr. Salz conducted reviews at only three prisons, spoke to a small percentage of developmentally disabled prisoners, and did not speak to any custody staff.  Salz at RT 135:18-20, 137:1-12, 136:14-20.

191.   Dr. Salz does not routinely provide written reports about these visits to the institutions.  Salz at RT 135:23-136:1.  Defendants presented no evidence of the results of these reviews.

192.   Correctional Counselor II Specialists[7] in the prisons are charged with, among other things, overseeing the Clark Remedial Plan at the local level.  Wells at RT

_____

[7] As a result of a court order in another prison reform case in this Court, 26 Correctional Counselor II Specialist positions were added at some of the prisons in 2007. Wells at RT 445:13-17; 445:25-446:3; Armstrong v. Schwarzenegger, Case No. C 94-2307 CW, Injunction, January 18, 2007 (Armstrong Dkt #1045) at 5.

170:17-171:9.  One of their responsibilities is to work with the ADA Coordinators and other prison staff to ensure that training is provided and that staff understands the Clark Remedial Plan. *Id.* at 170:17-171:9, 179:7-180:7; Aref at RT 274:9-24.  Correction Counselor II Specialists are supposed to provide reports of non-compliance to headquarters officials.  Wells at RT 180:8-15.

193.    These reports do not satisfy the audit and compliance review requirements of the Clark Remedial Plan: the Correctional Counselor II Specialists do not use a standardized tool that has been vetted by plaintiffs' counsel and the reports are not formal audits.  Wells at RT 453:20-456:12, 454:24-455:9.

194.    The Office of Court Compliance is charged with monitoring compliance issues at individual prisons.  Wells at RT 169:5-170:2.  The Office also does not effectively identify problems.  Many serious issues that were discovered by the Court expert and plaintiffs' counsel were unknown to the Office of Court Compliance.  See, e.g., Wells at RT 449:22-450:21 (facility captain at Office of Court Compliance not shown Prison Law Office monitoring report from Lancaster [Tr. Ex. 1003], alleging that three staff members had been calling DD prisoners "girls," "fagots," "boy" and yelling needlessly at them[8]), 491:2-492:9 (facility captain at Office of Court Compliance never shown administrative segregation forms indicating no staff assistant assigned to DD prisoners and does not know whether any corrective or disciplinary actions were taken), 549:6-13 (facility captain at Office of Court Compliance never shown parole documentation indicating that no effective communication provided to DD prisoners).

## III.    Defendants Have Failed to Meet their Burden of Proof

195.    As discussed in the Conclusions of Law, defendants bear the burden of proof on their termination motion.  They must demonstrate that there are no current or ongoing violations of the statutory and constitutional rights of the plaintiff class that

---

[8] This testimony is of particular concern since at Lancaster, Correctional Counselor II Specialists typically accompany plaintiffs' counsel during the monitoring tours. Wofford at RT 401:20-22.

warrant continuing relief.  The Court finds that defendants have fallen short of meeting this burden as to the majority of the existing prospective relief.  Even if the burden were on plaintiffs, the evidence set forth in the previous section demonstrates that developmentally disabled prisoners are currently subject to systemic constitutional and statutory violations in California prisons, and the evidence put forth by defendants fails to rebut that case in any significant way.

196.    Defendants' evidence falls into four categories: (1) testimony from officials from CDCR headquarters regarding their written policies, the implementation of those policies, and staff training requirements; (2) testimony from individual prison staff members regarding their personal actions in addressing the needs of some developmentally disabled prisoners; (3) rebuttal expert testimony regarding Dr. Leone's report; and (4) documentary evidence.  These categories are addressed in turn below.

### A.    CDCR Officials

#### 1. Terri McDonald and Richard Subia

197.    Two high-level custodial officials testified for defendants:  Terri McDonald, who is the Chief Deputy Secretary of Adult Operations and third in command of the CDCR, and Richard Subia, who is the Deputy Director of the Division of Adult Institutions.  McDonald at RT 928:10-11; Subia at RT 215:22-216:3.  These officials testified that they are confident that CDCR follows the dictates of the Clark Remedial Plan (CRP) (Subia at RT 220:7-221:1), with Ms. McDonald going so far as to state her conviction that the state is "in substantial compliance" with its requirements, McDonald at RT 939:24-25, 959:18-19.  Although the sincerity of these witnesses is not in doubt, for the reasons set forth below, the Court does not give credit to their conclusions.

198.    These assertions cited above were not supported by any personal knowledge of prison conditions for developmentally disabled prisoners.  Neither Ms. McDonald nor Mr. Subia had spoken to developmentally disabled prisoners or designated DDP staff regarding issues facing developmentally disabled prisoners.  McDonald at RT 950:3-6

1
2
3
4
5
6
7
8
9

(does not tour prisons to ask about substantive <u>Clark</u> matters), 16-18 (has never asked a prisoner about a substantive <u>Clark</u> matter); Subia at RT 249:16-21 (in the last two years, has not spoken to any DD prisoners or to correctional officers regarding the DDP). Nor did these witnesses have sufficient knowledge from reliable secondary sources: neither regularly reviews any reports regarding <u>Clark</u> compliance. McDonald at RT 949:13-23 (does not review Court experts' or plaintiffs' counsel's monitoring reports); Subia at RT 239:12-18, 242:12-14 (has not received reports from the Court experts until Dr. Leone's 2010 report), 268:9-12 (has not been on monitoring tours with plaintiffs' counsel "within the last couple of years").

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

199.    Further, Ms. McDonald has not talked to Office of Court Compliance staff involved in <u>Clark</u> monitoring in the 14 months she has been Chief Deputy Secretary. McDonald at RT 950:19-951:4. Mr. Subia testified that although he is aware that staff members are supposed to document the services they provide to developmentally disabled prisoners, in his current position he has not reviewed logs or seen evaluations of whether logs are reliably documenting services. Subia at RT 242:12-25. He has neither performed nor reviewed any analysis to determine if DDP training is effective. <u>Id.</u> at 243:1-6. He has done no investigation or evaluation to determine whether developmentally disabled prisoners receive staff assistants at disciplinary hearings. <u>Id.</u> at 245:6-9. Although he acknowledged that, as a group, developmentally disabled prisoners are vulnerable to exploitation and abuse, including sexual and physical assault, from other prisoners (<u>id.</u> at 246:3-4, 246:18-20, 247:8-20) and stated that protecting developmentally disabled prisoners requires more supervision and oversight by staff than protecting non-disabled prisoners does (<u>id.</u> at 247:21-24), he was not aware of any evaluation of whether CDCR's staffing is adequate to protect developmentally disabled prisoners,[9] <u>id.</u> at 247:25-248:2.

200.    The central questions before the Court are whether defendants act in

27
28

[9] At least one factual error also undercut Mr. Subia's testimony. He claimed that there are 12 prisons designated for DD prisoners when in fact there are only 10. Subia at RT 220:5-6; Stipulated Fact 9.

accordance with their obligations under the law as embodied in their written policies and procedures and the required training, and whether those policies and procedures and training are adequate to safeguard the federal rights of the plaintiff class. Neither Ms. McDonald nor Mr. Subia could shed any light on either point, since neither had any personal knowledge to offer.[10]

## 2.   Dr. Donald Salz

201.   Dr. Donald Salz, Chief Psychologist at CDCR Healthcare Services-Mental Health, also testified about CDCR treatment of developmentally disabled prisoners and compliance with the Clark Remedial Plan. Salz at RT 40:5-6. Dr. Salz is responsible for clinical assessments of developmentally disabled prisoners and staff training in the DDP. Id. at 42:4-9. Although not designated by defendants as an expert, he testified that in his opinion, the DDP has changed prison culture in California for the better in the last 15 years. Id. at 104:24-106:6. According to Dr. Salz, people who have been promoted in the prison system since the DDP training began "are people that get it, people that understand that Americans with [D]isabilities [A]ct is real law, needs to be followed, even inside a prison and they get it and they promote it. They support it when we do[] our audits and we brought up problems with them, they support it wholeheartedly." Id. at 105:15-20.

202.   However, Dr. Salz's testimony lacked foundation because of his extremely limited knowledge of current conditions. He has done only three audits in the past two years (id. at 135:18-20) and has talked to no more than 20 developmentally disabled prisoners in that time period, id. at 137:1-12. His areas of responsibility in the DDP are limited to clinical assessments of prisoners and training. Id. at 42:4-9. His personal knowledge does not extend outside of these areas: his audits addressed only the testing and identification processes, and not custodial matters, and only "occasionally" included

---

[10] Similarly, the draft audit tool, about which Ms. McDonald and Mr. Wells testified about in great detail, demonstrates only that compliance with one Clark Remedial Plan requirement has begun, many years late. It does not show that defendants are in compliance with the rest of the Remedial Plan, that there are no statutory or constitutional violations, or that they are capable of self-monitoring.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

conversations with correctional officers.  Id. at 136:14-20.  Thus, for example, he has no personal knowledge of whether developmentally disabled prisoners are given help with reading and writing.  Id. at 142:9-11, 142:17-143:1, 143:9-13.  He has no role with regard to placement of developmentally disabled prisoners.  Id. at 143:14-144:15.  He has no personal knowledge of whether staff assistants are assigned to developmentally disabled prisoners who need them.  Id. at 141:18-142:5.  Dr. Salz's opinions regarding general compliance lack foundation.

203.    Nor is Dr. Salz's testimony on those topics about which he does have personal knowledge–clinical assessments and training–particularly helpful.  The Court's serious concerns regarding CDCR's clinical assessments and Dr. Salz's testimony on that topic are set forth in § II.B, *supra*.  Regarding training, there is no dispute that training is helpful.  The only questions are (a) whether the training is being provided as required, and (b) whether the required training is adequate to ensure that the needs of the plaintiff class are met.  Dr. Salz's testimony provided no evidence on either of those points:  he has no personal knowledge of whether staff is actually receiving the required training (id. at 145:12-15) and, in fact, admitted that staff members have used improper training materials in the field.  Id. at 131:21-23.  Dr. Salz simply does not know whether the needs of the plaintiff class are being met.

### 3.    Richard Wells

204.    The defense witness with the most knowledge of defendants' remedial efforts in this case was Richard Wells, a facility captain in the Office of Court Compliance.  The Office of Court Compliance, an arm of CDCR's legal office, manages compliance efforts for Clark as well as other class action lawsuits.  Wells at RT 169:5-11.  The task of the Office is to monitor compliance, provide training, and ensure that the mandates of the Clark Remedial Plan are met.  Id. at 169:19-170:2.

205.    Mr. Wells testified that staff is trained to protect canteen purchases of developmentally disabled prisoners by escorting them to pick it up and/or inventorying

their property (id. at 192:17-193:1), to help them with showers and hygiene (id. at 195:15-196:8), and to be aware of their vulnerability to abuse.  Id. at 193:18-194:2.  However, he also testified that he did not know whether all staff members have received training (id. at 554:17-19) and that staff sometimes uses improper training materials.  Id. at 554:1-4.  Thus, the questions regarding the adequacy of training, raised by Dr. Leone, and the disputed matter of whether all staff receive the required training with the appropriate materials were not resolved by his testimony.

206.   Mr. Wells testified that the Office of Court Compliance has staff at the prisons who are their "eyes and ears" on Clark compliance.  Id. at 171:1-9.  According to Mr. Wells, these supervising correctional counselors (known as CCIIs) ensure compliance with the Clark Remedial Plan, work with the ADA Coordinators and other staff to remedy any problems, and provide information weekly to Mr. Wells and his staff.  Id. at 179:7-180:25.  Significantly, however, Mr. Wells never directly stated that defendants were in compliance with the Clark Remedial Plan, nor did he comment on Dr. Leone's report or refute any of his conclusions.  His testimony avoided the critical question that the Court must address—whether there are current violations of constitutional and statutory rights—and instead focused on the infrastructure that defendants have established to comply with the mandates of the Remedial Plan, including policies and procedures, training, and staffing both at headquarters and at the institutions.

207.   Whether that infrastructure is adequate to provide sufficient services to plaintiff class members was not answered by Mr. Wells, since, like all of the other headquarters officials who testified, he lacked sufficient information about problems with Clark compliance.  He did not know whether all developmentally disabled prisoners who need help reading and writing actually receive it.  Id. at 555:8-12.  He did not recall receiving or reviewing plaintiffs' counsel's 2008 report raising serious concerns about compliance at Lancaster and did not recall anyone bringing problems set forth in that report to his attention.  Id. at 449:22-450:3, 451:3-5.  Although he did review Dr. Leone's

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2008 report, which raised serious concerns about compliance at Lancaster, he neither directed staff to take corrective action, nor asked Mr. Subia to do the same.  Id. at 469:24-470:16.

208.    Mr. Wells's testimony was further undercut by the documentation of Clark Remedial Plan violations.  He admitted that numerous recent administrative segregation placement notices he was shown demonstrated Clark Remedial Plan violations through the failure to provide developmentally disabled prisoners with staff assistants.  Id. at 474:25-475:12; 476:10-20; 482:24-483:3; 484:6-17; 486:10-22; 487:21-24; see also Tr. Exs. 306-07, 323, 331, 333, 335.  He had never seen these documents before and admitted that he did not know if any corrective or disciplinary actions had been taken against staff whose violations were documented on the forms.  Wells at RT 491:2-18, 22; 492:4-9.  The record contains many additional examples of similarly deficient notices.  See Tr. Exs. 287, 288, 321, 337-39, 341, 350, 364-75, 377-82, 392-93.

209.    Similarly, Mr. Wells was shown numerous forms notifying developmentally disabled prisoners of their parole conditions that failed to document adequate accommodations or assistance, as required by CDCR policy.  Wells at RT 502:25-503:7, 503:19-24, 509:9-14, 509:20-22, 541:20-542:5, 543:5-10, 544:20-545:5, 545:18-546:3, 547:7-14; see also Tr. Exs. 27, 29, 30, 33, 95, 97, and 99.  These forms thus documented violations of CDCR rules.  Wells at RT 503:3-7, 509:12-22, 542:1-6, 543:5-10, 544:19-545:5, 545:24-546:11, 547:10-14.  He had never before seen any of the non-compliant conditions of parole forms.  Id. at 549:6-7, 13.  The record contains many additional examples.  See Tr. Exs. 23-26, 28, 31-32, 34-94, 96, 98.

210.    Mr. Wells's testimony thus does not contradict the overwhelming evidence of systemic Remedial Plan violations as discussed in § II, *supra*.  Indeed, it is entirely consistent with the picture painted in Dr. Leone's report: that defendants have made some advances in their treatment of developmentally disabled prisoners, that they have good policies and helpful training, and that some committed, well-intentioned staff members

provide some services to some prisoners, but that the efforts fall far short of meeting the needs of a majority of plaintiff class members, many of whom are forgotten or ignored and left without the help they need to function in the dangerous and difficult prison environment.

**B.    Staff at the Various Prisons**

211.    Nine ADA Coordinators, four DDP counselors, and four DDP officers from a total of six California prisons[11] testified live and by deposition for defendants.[12]  The Court finds that the testimony from staff members at various prisons regarding their work with individual class members is not adequate to demonstrate systemic compliance or to counter plaintiffs' evidence showing systemic violations of federal law and the Clark Remedial Plan.

212.    As discussed in more detail below, the testimony of several ADA Coordinators that their institutions are compliant with the requirements of the Clark Remedial Plan lacks foundation: they simply do not know enough about compliance matters at their prisons.  Other testifying staff members are not credible in describing their prison's compliance performance because they are ignorant of the requirements of the Remedial Plan and of the needs of developmentally disabled prisoners, are failing to perform their work adequately, and have not received necessary required training.

213.    After weeding out the testimony that lacks credibility or foundation, what remains are isolated examples of some services provided to plaintiff class members.  Such isolated examples are entirely consistent with the findings of the Court expert.

**1.    Some ADA Coordinators Lack Foundation to Testify about Compliance in their Prisons**

214.    ADA Coordinators are charged with ensuring compliance with the Clark

---

[11] The six prisons -- R.J. Donovan, SATF, California Rehabilitation Center, Lancaster, CMF, and Deuel Vocational Institution -- were all visited by the Court expert before he drafted his report.

[12] The parties stipulated that the direct testimony of the prison staff witnesses who appeared only by deposition would be substantially similar to the direct testimony of their counterparts who appeared in person, and the Court has considered that stipulated testimony in making these Findings.  See RT 375:12-376:4.

Remedial Plan at their prisons.  CRP at 41; Prud'homme Dep. (Tr. Ex. 488) at 22:3-6, 28:18-21; Wells at RT 171:22-24.  In the absence of a state-wide standardized comprehensive system to measure compliance in the institutions, ADA Coordinators' methods for ensuring compliance varied widely.  Some did not speak to staff or developmentally disabled prisoners or review documents.  As a result, some ADA Coordinators lacked foundation to testify about whether plaintiff class members at their prisons are provided necessary accommodations.

### a.    No Personal Knowledge

215.    In some cases, ADA Coordinators lacked personal knowledge about whether their staff were following Remedial Plan requirements.  Prud'homme Dep. at 114:8-24 (ADA Coordinator at SATF lacks personal knowledge whether all needs of DD prisoners are being met), 198:15-199:1 (no personal knowledge whether staff assistants always assigned to DD prisoners at classification proceedings), 62:4-19, 65:1-6, 65:21-67:1 (same), 198:8-14 (no personal knowledge whether staff assistance provided to DD prisoners during grievance process); Ynson Dep. at 55:13- 57:13 (ADA Coordinator at Lancaster not personally aware if lesson plan for staff training includes instructions on how to prompt DD prisoners), 61:5-16 (no personal knowledge as to whether staff at Lancaster encourage DD prisoners to participate in beneficial programs and services), 121:24-122:19 (no personal knowledge whether staff assistants assigned at disciplinary hearings, whether effective communication is achieved, or whether staff ensure DD prisoners understand the nature and importance of disciplinary proceedings), 123:25-124:3 (no personal knowledge whether staff assistants assigned to DD prisoners at administrative segregation hearings), 135:15-18 (no personal knowledge whether staff is assigned to facilitate DD prisoners' use of grievance system), 140:17-141:13 (no personal knowledge whether DD prisoners receiving staff assistance filling out grievance forms when they requested help from correctional counselors, housing staff, or DD staff, and not aware if enough staff members are available to help DD prisoners with grievance forms),

146:12-16 (no personal knowledge whether Lancaster staff take specific measures to protect DD prisoners from abuse by other prisoners), 147:16-21 (no personal knowledge whether staff who provided orientation to DD prisoners were trained to communicate with them), 151:2-4 (no personal knowledge whether DD prisoners notified of conditions of parole before release), 114:21-24 (no personal knowledge that staff assistants assigned at classification hearings except on four occasions), at 115:7-15 (no personal knowledge that effective communication achieved during classification hearings while ADA Coordinator), 119:20-120:3 (no personal knowledge that a staff assistant speaks to DD prisoners who refuse to appear at classification committee hearings); Nies Dep. (Tr. Ex. 492) at 142:23-143:2, 141:4-6 (ADA Coordinator at Deuel Vocational Institution could not verify whether DD prisoners were provided with required assistance in administrative proceedings because he never attended a disciplinary hearing of a DD prisoner while ADA Coordinator).

### b.    No Foundation for Claiming Compliance

216.    Given the seriousness of the compliance problems presented to the Court and the undisputed duty of staff to proactively offer help to plaintiff class members (see § II.C.1.f),  it is not sufficient for prison officials to opine that prisoners' needs are met because the officials do not hear complaints.  At least one ADA Coordinator's opinions regarding compliance rested on just such faulty grounds.  Prud'homme Dep. at 121:5-122:10 (ADA Coordinator confident that staff explain conditions of parole in a way that DD prisoners can understand because nobody has raised any problems with him), 108:3-14 (believes that DD prisoners who need help reading and writing are receiving it because he hears very few complaints, does not see that it's not being done and does not hear about problems from his staff), 132:6-15 (bases his belief that staff provided adaptive support services to DD prisoners as needed on "how well our DD population functions").

217.    The questions before the Court are whether defendants implement their written policies and the required trainings, and whether those policies and trainings

- 77 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

effectively protect the rights of plaintiff class members–not whether those policies and trainings merely exist.  But some ADA Coordinators' assertions that their prisons were in compliance relied on only the existence of policies and trainings.  Valdez Dep. (Tr. Ex. 493) at 128:21-130:1, 139:24-141:15 (former ADA Coordinator from R.J. Donovan could not testify that he knew whether staff were sensitive to the needs of DD prisoners and alert to possible abuse, only that staff were trained in these areas); Nies Dep. at 133:6-134:8 (ADA Coordinator from DVI could not testify that he knew whether staff were alert to possible abuse, only that staff were trained in that area).[13]

218.    Some ADA Coordinators do not know or investigate whether plaintiff class members' rights are violated under the Remedial Plan and federal law.  Nies Dep. at 94:12-14 (ADA Coordinator at DVI does not know how often counselors go into housing units and no documentation of this), 33:10-11, 33:16, 18, 34:16-20, 34:22-36:22 (no knowledge of what, how, and whether transfer of DD prisoners out of  Reception Center is expedited, as required by the Remedial Plan [CRP at 9-10] and the prison's Operational Procedure [Tr. Ex. 1024 at 12]; Gonzalez Dep. (Tr. Ex. 483) at RT 165:11-24 (former ADA Coordinator at California Medical Facility [CMF] has never investigated whether staff inform plaintiff class members about their parole conditions in a way that they can understand or whether staff inform parole officers of class members' disabilities); Cowan Dep. (Tr. Ex. 494) at 59:19-25 (ADA Coordinator at R.J. Donovan does not know how counselors explained conditions of parole to DD prisoners).

219.    Some ADA Coordinators had not reviewed adequate documentation to claim compliance.  Prud'homme Dep. at 132:6-133:8 (ADA Coordinator at SATF believes that staff are providing adequate adaptive support but has only reviewed adaptive support logs twice, one year before his deposition), 142:10-11 (does not review

---

[13] At the same time, some ADA Coordinators did not even know whether required training was provided.  Prud'homme Dep. at 131:13-16 (ADA Coordinator at SATF could not say that every staff member received each required trainings); Nies Dep. at 139:20-22 (ADA Coordinator at DVI does not know whether all staff serving as staff assistants have received appropriate training).

documentation from administrative segregation hearings to determine whether staff assistants assigned), 139:21-140:22 (does not audit documentation from classification proceedings to ensure that assistant assigned); Ynson Dep. at 73:23-25 (did not review adaptive support logs while ADA Coordinator); Gonzalez Dep. at 102:11-14, 113:2-5, 120:12-19, 108:1-25; 128:3-129:18 (former ADA Coordinator at CMF never reviewed DD prisoners' documentation from disciplinary, classification or administrative segregation placement proceedings to determine whether required assistance provided); Cowan Dep. at 99:21-25 (ADA Coordinator at R.J. Donovan does not review documentation to assess whether staff assistants assigned classification).

220.    Some ADA Coordinators rarely spoke to DDP staff or developmentally disabled prisoners, similarly limiting their ability to testify competently regarding compliance.  Gonzalez Dep. at 166:12-168:10, 171:7-11 (former ADA Coordinator at CMF did not speak to staff about frequency of contacts with DD prisoners); Mandeville Dep. (Tr. Ex. 485) at 14:22-15:21 (ADA Coordinator from CMF has only minimal direct contact with DD prisoners).

221.    Further evidence that these defense witnesses lacked foundation to testify about Clark compliance comes from the testimony of DDP officers and counselors from multiple institutions, who described minimal oversight by and interaction with ADA Coordinators.  Banks Dep. (Tr. Ex. 484) at 71:10-12 (DDP officer at CMF has no interactions with ADA Coordinator); Pearson at RT 367:9-13 (DDP officer at California Rehabilitation Center only saw ADA Coordinator in housing unit two or three times and never saw him look through the locked box containing 128C-2s); Horne Dep. (Tr. Ex. 482) at 169:22-170:3 (DDP officer at Lancaster did not know who current ADA Coordinator was); Rhodes Dep. (Tr. Ex. 487) at 108:19-23, 109:1-3 (DDP counselor at Lancaster did not know who ADA Coordinator was or what his duties are); Clausing Dep. (Tr. Ex. 491) at 40:23-41:21 (ADA Coordinator at SATF seen by DDP officer in housing unit no more than six to seven times in last two years); Chapa Dep. (Tr. Ex. 489) at

214:25-215:5 (DDP counselor at SATF did not inform the ADA Coordinator about grievance alleging that DD prisoners were being discriminated against, harassed, and assaulted); Tr. Ex. 253.

### 2. Some Prison Staff Are Ignorant of Requirements of the Clark Remedial Plan and of Needs of Developmentally Disabled Prisoners

222.   The testimony of other prison staff was not credible because they do not know the requirements of the Remedial Plan and they do not understand the characteristics and needs of developmentally disabled prisoners.

### a.   Ignorance of Requirements of the Clark Remedial Plan

223.   Some ADA Coordinators, DDP officers, and DDP counselors did not know the requirements of the Remedial Plan.

224.   Defendants classify plaintiff class members as DD1, DD2, and DD3 based on the nature and severity of the developmental disability, adaptive deficits, and adaptive support services required.  CRP at 3-4, 20-23; Salz at RT 75:5-21.  However, at least one ADA Coordinator was unaware of these designations or of their significance.  Gonzalez Dep. at 36:7-37:5 (former ADA Coordinator at CMF had no opinion about whether DD2s have greater need for adaptive support than DD1s and whether DD3s have greater need for adaptive support than DD2s).

225.   DDP officers and counselors are required to document adaptive support services, prompts, contacts, and issues relating to developmentally disabled prisoners.  CRP at 42.  But at least one staff member was unaware of this requirement.  Chapa Dep. at 131:11-21; 214:5-19 (DDP counselor at SATF for almost 11 years had never documented any adaptive supports he provided to DD prisoners in housing unit log until ADA Coordinator told him six months ago that he had do so because "the Prison Law Office was getting picky").

226.    The Remedial Plan requires that an Interdisciplinary Support Team (IDST)
act as the classification committee for plaintiff class members at the <u>Clark</u> designated
prisons.  CRP at 24-25.  The IDSTs review the developmentally disabled prisoner's
custody, classification, program, and adaptive support at varying intervals, depending on
the designation of that prisoner.  Correctional officers are required to participate in and
provide support services at the IDST.  CRP at 42.  However, some prison staff members
showed a profound ignorance of these committees and their duties.  Banks Dep. at 63:13-
64:3 (DDP officer does not know what IDST is); Gonzalez Dep. at 136:14-137:12 (former
ADA Coordinator at CMF not aware of required frequency of classification committee for
DD2s and DD3s).

227.    Plaintiff class members are entitled to assistance so that, to the best of their
ability, they can understand and participate in administrative proceedings.  CRP at 8.  To
this end, defendants must assign staff assistants trained to communicate with
developmentally disabled prisoners in disciplinary, classification, and administrative
segregation placement hearings.  <u>Id.</u> at 8, 49-50; <u>see also</u> Salz at RT 120:1-122:1
(communicating effectively with DD prisoners means making language more concrete and
having the prisoner repeat back the statement in his own words).  However, some prison
staff members did not know or understand these requirements.  Banks Dep. at 61:6-11,
61:25-62:5 (DDP officer at CMF believes that when serving as staff assistant for DD
prisoner, it is adequate to ensure that that prisoner understands by "speaking in normal
English"); Ynson Dep. at 127:2-19 (ADA Coordinator at Lancaster not concerned that
staff assistant not assigned at administrative segregation hearing because captain decided
it was not necessary), 137:19-138:17 (same).

228.    Some CDCR staff members testified as to their ignorance of the <u>Clark</u>
program at their own institutions.  Gonzalez Dep. (Tr. Ex. 483) at 62:19-63:14, 64:10-23;
170:13-171:4 (former ADA Coordinator unaware of use of adaptive support logs in
housing units), 26:14-19 (same witness did not know how many DDP officers were at

institution); Mandeville Dep. at 41:25-42:4 (ADA Coordinator does not know where various classifications of DD prisoners are housed at CMF); Banks Dep. at 26:4-19 (officer at CMF does not know the name of the counselor she would need to speak with to find out what adaptive services a DD prisoner needs); Ynson Dep. at 37:17-25 (does not know if DD prisoners were housed in general population while he was ADA Coordinator).

### b. Staff Members Do Not Understand Needs of Developmentally Disabled Prisoners

229.   Staff members from several prisons demonstrated ignorance and a lack of understanding of the needs of prisoners with developmental disabilities.

230.   Because developmentally disabled prisoners are particularly vulnerable to abuse from other prisoners, one of the purposes of the Clark program is to provide protections for this group.  Tr. Ex. 1 at 2; Cowardin Report at 20; Salz at RT 126:10-13. However, many staff members were indifferent to the greater likelihood for abuse of developmentally disabled prisoners.  Banks Dep. at 29:17-31:1; Gonzalez Dep. at 66:16-21, 66:25-67:10 (DD prisoners are not necessarily more susceptible to abuse than other prisoners, so it would be "tunnel vision" for DDP officers to focus on them).

231.   As noted in § I.F, some prisoners with developmental disabilities exhibit behavior that challenges popular belief about developmental disabilities, work to mask their disabilities, and have high functional capacity in some areas while demonstrating serious deficits in others.  Nevertheless, some prison staff members erroneously believe that some prisoners have been wrongly designated by prison clinicians as developmentally disabled due to the prisoners' appearance or skill sets in some areas.  Chapa Dep. at 235:4-236:1 (DDP counselor at SATF believes that certain prisoners who carry themselves a certain way and know some rules are not developmentally disabled); Horne Dep. at 102:17-103:7 (DDP officer at Lancaster believes that DD prisoners who do not routinely ask for assistance have the ability to function and solve problems).

### 3. Prison Staff Violate their Remedial Plan Duties

232.   Other prison staff members were clearly failing to perform their work

adequately.  Staff duties with regard to developmentally disabled prisoners are clearly outlined in the Clark Remedial Plan.  CRP at 41-45.  Nevertheless, noncompliance with many of these requirements was almost universal and some of these instances of noncompliance were egregious.

233.    DDP officers are required to maintain frequent contacts with and monitor daily activities of developmentally disabled prisoners.  CRP at 7-8, 42.  But some staff witnesses do not regularly check in with or monitor prisoners with developmental disabilities and are poorly supervised in this area.  Banks Dep. at 32:20-35:12, 83:13-16; Gonzalez Dep. at 168:22-169:12, 171:7-11; see also Mandeville Dep. at 70:23-71:13, 118:14-119:2 (ADA Coordinator had no expectation about the appropriate frequency of staff contact with DD prisoners).

234.    Similarly, prison staff members fail to provide necessary reading and writing assistance to plaintiff class members, do not remind plaintiff class members to take care of basic life needs, fail to protect plaintiff class members from theft and abuse, and fail to ensure that plaintiff class members understand prison due process proceedings.

235.    It was undisputed that staff must be proactive in seeking out the needs and concerns of plaintiff class members.  § II.C.1.f.  But some prison staff members do not affirmatively provide assistance to prisoners with developmental disabilities.  Banks Dep. at 29:7-16 (officer does not know if there was ever a time when she provided services to DD prisoners because of information in their 128C2); Brown Dep. (Tr. Ex. 486) at 32:9-14 (DDP counselor at CMF would not volunteer help during open line); Chapa Dep. at 138:16-139:24 (DDP counselor at SATF believes some DD prisoners might be afraid to talk to staff but does not determine which prisoners have never approached him to ask for help); Horne Dep. at 102:17-103:7 (DDP officer at Lancaster does not ask DD prisoners who do not routinely ask for assistance ask why they are not asking for help); Valdez Dep. at 107:2-16 (officers at R.J. Donovan do not explain prison rules to DD prisoners unless the prisoners ask them); Banks Dep. at 47:1-24.

236.    The Clark Remedial Plan requires that all custody staff members receive annual overview trainings that include information about, among other topics, developmental disabilities, behaviors indicating developmental disabilities and types of adaptive support services that must be provided by prison staff members to prisoners with developmental disabilities.  CRP at 59-61; Wells at RT 554:7, 554:13-14.  In addition, prison staff members serving as staff assistants, participating in disciplinary and classification proceedings, and taking on other roles must be trained with the use of specialized training modules.  CRP at 61-62; Wells at RT 554:7-14, 161:16-162:8.

237.    One reason why prison staff members' testimony reveals gaps in compliance might be that some of these defense witnesses had never received—or cannot recall receiving—part or all of the required training.  Brown Dep. at 15:24-16:23, 76:8-15, 107:15-17 (counselor at CMF cannot recall getting staff assistant training and serves as a staff assistant every few weeks), 136:8-21 (same counselor does not recall training before becoming or during time as a Clark counselor, other than annual overview training), 112:25-113:7 (same counselor not trained on effective communication with DD prisoners); Gonzalez Dep. 50:7-15 (former ADA Coordinator at CMF does not know how long the Clark training is, or what it consists of), id. at 131:1-16 (ADA Coordinator did not receive all of required training); Valdez Dep. at 133:3-12 (staff members at R.J. Donovan did not receive overview Clark training from a clinician, as required by the CRP [CRP at 61]); Ynson Dep. at 54:22-55:12 (ADA Coordinator at Lancaster did not receive required annual refresher training in 2009).

238.    Further, at least one prison official was not even aware of crucial training requirements.  Valdez Dep. at 135:23-137:15 (ADA Coordinator at RJD is not aware of specific training required for staff assistants).

### 4.    Testimony from a Few Staff Members at Individual Prisons Does Not Prove Systemic Compliance

239.    Some prison staff members testified credibly that they work to meet the needs of developmentally disabled prisoners.  See, e.g., Prud'homme Dep. at 88:19-90:7;

Serna at RT 347:15-348:12 (assists DD prisoners with reading and writing), 350:17-352:6 (accommodations at classification hearings).  However, the attentiveness of a handful of staff chosen to testify for the defense does not capture the experiences of plaintiff class members in other institutions, or even in the same institution when the particular staff person is not on duty.  Such testimony, like that of Mr. Wells, is entirely consistent with Dr. Leone's findings that the California prison system is characterized by indifference to developmentally disabled prisoners, with sporadic examples of compliance from particular staff.

### C.   Defendants' Case in Rebuttal

240.   Defendants' case in rebuttal is no more persuasive than their case in chief. Defendants did not rebut at the hearing a single fact that Dr. Leone relied on to support his opinion that there exists a pattern of indifference to the basic needs of plaintiff class members.  Although some individual staff members from some of the same prisons Dr. Leone visited testified that they provided assistance to developmentally disabled prisoners at those institutions (see, e.g., Serna at RT 338:16-339:1, 341:14-342:2, 347:15-348:12; Horne Dep. at 43:25-44:6; Brown Dep. at 33:14-16; Clausing Dep. at 87:10-25), this testimony does not rebut his findings that *despite* the efforts of some helpful staff, many prisoners' needs are not being met.  See, e.g., Serna at RT 349:11- 350:4 (cannot always assist every DD prisoner who requests assistance); Banks at 79:21-80:1 (only assists DD prisoners with 602 forms).  Not one prisoner interview, staff interview, or document relied on by Dr. Leone was directly challenged by any of defendants' evidence at the hearing, despite the fact that defendants had nearly three months to investigate the report before the hearing.[14]

----

[14] The Court does not credit defense counsel's assertions that defendants could not investigate Dr. Leone's statements because they did not possess his "key"—the names and numbers of the prisoners he discusses in his report.  Subia at RT 251:9-252:2.  Dr. Leone provided the key shortly after he issued his report, on February 26, 2010.  Tr. Ex. 479. Dr. Leone placed no limitation on defense counsel's ability to share that information with CDCR headquarters. Leone at RT 747:13-21; Tr. Ex. 2.  Nothing prevented defendants at that point, two and one half months before the hearing, from interviewing the staff and reviewing the documents that Dr. Leone relied on.

241.   Defendants' sole rebuttal expert witness was Dr. James Scaramozzino. Dr. Scaramozzino failed to provide any credible rebuttal testimony.  By his own admission he is not an expert in developmental disabilities or in statistics.  Scaramozzino at RT 858:7-9 (does not consider himself an expert in developmental disabilities), 858:10-12 (does not consider himself an expert in statistics).  He is not an expert in the main area of Dr. Leone's testimony—the operation of CDCR's programs for developmentally disabled prisoners—except in the narrow area of mental health.  Id. at 858:13-16.  Nor is he an expert in determining whether policies and procedures for disabled individuals are adequate to provide access to the program services and activities at the prison, except, again, for mental health.  Id. at 858:17-21.  In fact, Dr. Scaramozzino only spends 10% of his time on Clark issues, and that work only includes the mental health components, such as testing and referrals.  Id. at 859:24-860:14.  He thus cannot speak credibly to Dr. Leone's methodology or findings, except in the narrow area of the mental health component of the DDP.

242.   Dr. Scaramozzino's testimony is also unreliable because he has limited knowledge of any of the workings of the DDP.  He cannot say whether the DDP is an effective program.  Id. at 919:8-15.  He had not read the Clark Remedial Plan for at least a few years before he prepared his report.  Id. at 902:4-6.  In forming his opinions for this case, he did not tour any prisons, speak to any prison staff or developmentally disabled prisoners, review any prisoner files, review Dr. Leone's notes, or review any documents other than Dr. Leone's 2010 report.  Id. at 902:14-903:4.  Dr. Salz wrote various factual statements which Dr. Scaramozzino added to his report, although he had no independent

_____

(continued…)

The Court also gave defendants the opportunity to move to reopen the hearing to allow them to investigate Dr. Leone's findings, if they could justify their delay in doing so.  RT 1067:2-1068:5.  Defendants have submitted new evidence and ask this Court to consider it.  However, because Defendants have failed to explain why this evidence was not developed in a timely manner, and because consideration of this evidence at this stage would deprive Plaintiffs of the opportunity to cross-examine the relevant witnesses, this Court declines to consider it.  This is discussed more thoroughly below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

knowledge of their accuracy, the very criticism that he leveled at Dr. Leone.  Id. at 903:18-904:12.  He characterized the report as a "collaborative effort" between himself, Dr. Salz, and another CDCR psychologist.  Id. at 903:11-17.

243.    In Dr. Scaramozzino's opinion, Dr. Leone "focused all his attention on individual prisoners and did not look at the total system," such as interviews with staff regarding CDCR's processes to implement Clark and review progress.  James Scaramozzino Expert Report (Tr. Ex. 1195) at 1; see also Scaramozzino at RT 864:23-865:2.  According to Dr. Scaramozzino, Dr. Leone looked only at "one component of the program, the prisoner's opinions," while ignoring the state's "primary goal, which is:  Do I have the program in place to be able to attend to the issues?"  Scaramozzino at RT 873:19-24.  Dr. Scaramozzino misses the real question at issue in these proceedings:  not whether the state *has* a remedial plan—which is undisputed—but whether the state *follows* that plan.  Dr. Scaramozzino offered no evidence on that point.

244.    Dr. Scaramozzino's criticisms of Dr. Leone's work are deeply flawed—so flawed that he actually retracted some of them in his testimony.  He found fault with Dr. Leone for failing to review documentation or interview staff members to verify the accounts of specific prisoners.  Scaramozzino Report at 2; Scaramozzino at RT 881:10-21.  He admitted that this criticism was incorrect, however.  Dr. Leone had performed such reviews and conducted interviews (as noted in § II.A, *supra*) and Dr. Scaramozzino overlooked that statement in Dr. Leone's report.  Scaramozzino at RT 908:18-909:15.

245.    Dr. Scaramozzino also criticized Dr. Leone for not standardizing his interviews or clearly defining the relationship between DDP classifications and degree of self-reported problems.  Scaramozzino Report at 3-4.  However, when he wrote his report Dr. Scaramozzino did not know what questions Dr. Leone asked.  Scaramozzino at RT 893:2-7.  He only learned through listening to Dr. Leone's testimony at the hearing that Dr. Leone asked a specific set of open-ended questions.  Id. at 893:7-11, 900:25-901:3.  Dr. Leone's testimony answered his concerns in this area.[15]  Id. at 909:16-910:11.  His

---

[15] Dr. Scaramozzino provided no credible testimony as to why Dr. Leone's

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

concerns about the relationship between DDP classifications and degree of problems was also assuaged by Dr. Leone's testimony.  Id. at 911:3-15.

246.    Dr. Scaramozzino also criticized Dr. Leone for making findings based on evidence that developmentally disabled prisoners are subjected to abuse and exploitation. In Dr. Scaramozzino's opinion, one cannot draw any conclusions from abuse suffered by developmentally prisoners without knowing whether non-developmentally disabled prisoners are also subjected to such abuse.  Scaramozzino Report at 4; see also Scaramozzino at RT 865:20-24, 893:22-894:21.  Dr. Scaramozzino again misses the point. The question in this case is whether defendants have secured the federal rights of plaintiff class members, not whether other prisoners also suffer problems.  Scaramozzino at RT 913:5-12.

247.    Defendants have thus failed to rebut Dr. Leone's report.

**D.    Documentary Evidence**

248.    Defendants' documentary evidence does not cast doubt on plaintiffs' evidence.  For the most part, defendants' trial exhibits are written policies and procedures (Tr. Exs. 1023-28, 1030, 1032, 1049-51) and training materials (Tr. Exs. 1034-40, 1042-48, 1052, 1054-61, 1063, 1066-70, 1072-81).  As has been repeatedly stated, such documents do not prove that the policies contained within are followed or that the training is provided appropriately or is adequate to ensure that the rights of the plaintiff class are respected.

249.    The documentary evidence also includes plaintiffs' counsel's monitoring reports covering 17 prisons, dated from early 2008 to the middle of 2009 (Tr. Exs. 1003-

_____

(continued…)

approach is wrong.  The Court finds persuasive Dr. Leone's testimony that his questions were well designed to elicit useful information from the class members he interviewed. Defendants' witness, Dr. Salz, and plaintiffs' expert, Dr. Cowardin, corroborated the validity of his approach.  Salz at RT 80:16-17 (effective communication with DD prisoners requires the use of open-ended questions and more than no or yes answers); Cowardin at RT 656:8-20 (indicating that Dr. Leone is a professional trained in how to speak with individuals with disabilities).

10, 1012-19, 1021-22) [16] and two of Dr. Leone's reports from 2008 regarding Lancaster and CMF.  Tr. Exs. 1001-02.

250.   These documents present a balanced picture of defendants' compliance with the Clark Remedial Plan.  At certain tours and institutions, prisoners reportedly were receiving adequate accommodations and protections.  At other times, and sometimes at the same prisons, such services were absent.  For example, in June 2008, Dr. Leone found that CMF was "doing a good job of meeting the needs of dually-diagnosed inmates with DD on the EOP units."  Tr. Ex. 1002 at 4.  In early 2010, however, Dr. Leone found serious problems there: along with one other prison, CMF was "probably the most dysfunctional kind of set of circumstances, the least amount of protection, most victimization of the seven prisons that I visited."  Leone at RT 783:19-21.  For example, many prisoners "identified specific officers that they said made fun of them and other inmates with disabilities, threatened them, refused to issue ducats to inmates who needed to leave the unit for activities, filed false Rules Violation Reports against inmates that they did not like, and failed to provide support and/or assistance to them . . . ."  Leone Report at 15 (footnote omitted).

251.   Dr. Leone explained the varied findings in these monitoring reports:  "my sense is that this Clark [R]emedial [P]lan is not institutionalized, that it's heavily depend[ent] on which correctional officers might be on a particular unit at any given time.  So I may have visited [in 2008] during a period of time when there was very competent officers doing exactly what they've been trained to do."  Leone at RT 784:5-11; see also Tr. Ex. 1006 (California Men's Colony, March 2008) at 9 (backsliding in the disciplinary review process:  none of the disciplinary write-ups reviewed had a clinician review); Tr.

---

[16] Some of the reports written by plaintiffs' counsel and offered by defendants are of limited value because they concern prisons with very few class members.  See, e.g., Tr. Ex. 1005 at 1 (only nine DD prisoners housed at California Institution for Women at the time the report was generated), Tr. Ex. 1010 at 1 (only two DD prisoners housed at High Desert State Prison at the time the report was generated), Tr. Ex. 1013 at 1 (only seven DD prisoners housed at Pelican Bay State Prison at the time the report was generated), Tr. Ex. 1021 at 1 (only four DD prisoners housed at Valley State Prison for Women at the time the report was generated).

Ex. 1007 (CMF, October 2008) at 10 (40% of the disciplinary write-ups reviewed lacked a

clinician review, which was a worse record than the previous year).

252.    These reports are consistent with Dr. Leone's opinions and conclusions on

defendants' compliance.  For example, plaintiffs' counsel noted in a report that "at

multiple institutions, such as [California Men's Colony], prisoners report that the reality is

that staff simply refuse to provide such assistance when asked."  Tr. Ex. 1006 at 5; see

also Tr. Ex. 1003 (Lancaster, November 2008) at 3-5 (many of the adaptive support

evaluations generated by clinicians at Lancaster were inadequate and incomplete and

some appeared to classify the prisoner inaccurately), 7 (DD prisoners reported that

housing unit staff did not help them as needed; they were afraid to ask staff for help for

fear of negative consequences); Tr. Ex. 1004 (California Correctional Institution, October

2008) at 1 (institution "continues to have problems with training, ensuring staff assistants

are assigned for all [administrative segregation lock-up notices] and, as of this year, CCI

failed to ensure that a clinician review all" disciplinary write-ups), id. (staff were unable

to verify whether they had been trained in most of the required training modules over the

past year, which had also been noted in the previous year's monitoring report); Tr. Ex.

1006 (California Men's Colony, March 2008) at 1 (DD prisoners reported that they were

not being adequately accommodated), 5 (DD prisoners reported that staff was too busy to

help them or outright refused to help them), 6 (DD prisoners were relying on other

prisoners to help them, and did not feel that they had any other choice, which "is an

unacceptable practice"), 9 (institution backsliding in the disciplinary review process:

none of the disciplinary write-ups reviewed had a clinician review); Tr. Ex. 1007

(California Medical Facility, October 2008) at 2 (prison officials did not know whether

they were providing required DDP training), 6-7 (DD prisoners reported that they were

not receiving assistance from regular housing officers), 8 (DD prisoners reported that they

did not have staff assistants in classification and disciplinary hearings), 10 (40% of the

disciplinary write-ups reviewed lacked a clinician review, which was a worse record than

the previous year); Tr. Ex. 1008 (Corcoran, March 2008) at 1 ("[d]eficiencies still remain

with the clinician review process and the assignment of Staff Assistants in the disciplinary

process and in [administrative segregation lock-up notices]"); Tr. Ex. 1009 (DVI,

September 2008) at 3 (several disciplinary hearings for DD prisoners had no staff assistant

or clinician review of the disposition), 4 (according to staff, since there were so few

disciplinary write-ups for DD prisoners, the CRP requirements were forgotten),

id.("[f]ailure to comply with the Clark Remedial Plan requirements in the disciplinary

process for DDP inmates has been a recurring problem at DVI"), id. (administrative

segregation lock-up notices with no staff assistants); Tr. Ex. 1012 (Mule Creek,

September 2008) at 1 (Mule Creek "still does not comply fully with remedial plan

requirements" on training; same problem has been found for three monitoring tours in a

row), 4 (none of the disciplinary write-ups reviewed for the tour had been reviewed by a

clinician; Chief Deputy Warden and associate warden stated that "this area of non-

compliance had been a problem during several monitoring tours"); Tr. Ex. 1018 (Sierra

Conservation Center, November 2008) at 1 (institution not providing some of the required

DDP training); Tr. Ex. 1021 (Valley State Prison for Women, March 2008) at 1 (Valley

State "has continually either neglected to do" certain required DDP training "or has failed

to be prepared to report on the training during monitoring tours"); Tr. Ex. 1022 (Wasco,

July 2008) at 4 (class members complained that they were not receiving reading and

writing help from staff, that staff told them to seek help from other prisoners, and that they

were uncomfortable asking staff for help because they thought they would say no and be

angry about being asked), id. (failure to assign staff assistants and clinician reviews for

disciplinary write-ups, which had also been a problem the previous year),  5 (failure to

assign staff assistants for administrative segregation lock-up notices), 6 (failure to provide

Regional Center referral letters for DD prisoners who were paroling).

### E.    Defendants' Sur-Response

253.    On August 6, 2010, Defendants submitted a Sur-Response to Plaintiffs'

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Response to Defendants' Proposed Findings of Fact and Conclusions of Law.  This Sur-Response asked that this Court take into evidence a report prepared by the Division of Adult Institutions and filed on July 23, 2010.  See Doc. 489.

254.    Courts have discretion to reopen the record in certain circumstances. Defendants propose the following list of considerations: whether "(1) the evidence sought to be introduced is especially important and probative; (2) the moving party's explanation for failing to introduce the evidence earlier is *bona fide*; and (3) reopening will cause no undue prejudice to the nonmoving party."  Love v. Scribner, 691 F. Supp. 2d 1215, 1235 (S.D. Cal. 2010) (quoting Rivera-Flores v. Puerto Rico Tel. Co., 64 F. 3d 742, 746 (1st Cir. 1995)).

255.    Defendants fail to pass their own test.  First, the evidence sought to be introduced is the report prepared by the Division of Adult Institutions.  That report on its own is inadmissible, and hence cannot be important or probative.[17]  First, it cannot be admissible as an expert report as no effort has been made to qualify its authors as experts, nor were they disclosed as experts.  Second, it is clearly not an admissible business record because it was prepared, if not in advance of litigation, at least in the midst of litigation. Third, as explained in Plaintiffs' opposition, the Report itself does not reveal its methodology, and hence it is impossible to determine whether its conclusions are valid. See Doc. 493, at 5-6.  Fourth, it is comprised largely of inadmissible hearsay.

256.    Second, Defendants have failed to provide a bona fide reason that this evidence could not have been presented at the hearing.  As noted above, Dr. Leone provided all necessary information to Defendants so that they could carry out an investigation of his conclusions.  If Defendants had expressed any intent to respond to Dr. Leone's conclusions, their counsel had in their possession the information necessary for Defendants to conduct such an investigation.  However, Defendants failed to conduct such an investigation until this Court indicated that it was concerned by Defendants' failure to

---

[17]  Defendants have not moved to reopen the hearing itself, but rather have simply submitted this report.

respond.  The orderly presentation of evidence requires that parties prepare in advance of the hearing to present all relevant evidence.  A simple failure to plan ahead is not a bona fide reason justifying reopening the evidence.

257.    Third, and finally, Plaintiffs would be prejudiced by taking this Report into evidence.  They have not had the opportunity to depose or cross examine the individuals who compiled the report, and hence have had no opportunity to explore the report's weaknesses.

258.    For these reasons, this Court declines to consider the late-submitted Report.

1

**CONCLUSIONS OF LAW**

2

**I.    Defendants' Termination Motion Is Denied**

3

      **A.    Immediate Termination of the Plan Is Unwarranted Because the Settlement Agreement Meets the PLRA's Needs-Narrowness-Intrusiveness Requirement**

4

5

      259.    The PLRA requires that court orders in prisoner civil rights actions include

6

findings that the relief is narrowly drawn, extends no further than necessary to correct a

7

violation of federal rights, and is the least intrusive means of doing so.  18 U.S.C.

8

§ 3626(b)(2).  This Court did not make those findings explicitly at the time it ordered

9

implementation of the Settlement Agreement & Order of December 3, 2001 (Dkt # 194)

10

(Settlement Agreement & Order).  That omission, however, does not necessitate

11

termination of prospective relief in this case because the Settlement Agreement & Order

12

does in fact meet the PLRA standard.  For the reasons that follow, Defendants' motion to

13

terminate relief is DENIED.

14

      **1.    The Required Findings Are Implicit in the Relief**

15

      260.    In Gilmore v. California, the Ninth Circuit discussed the PLRA's immediate

16

termination provision:

17

> We do not read [Section 3626(b)(2)] to mean that explicit findings must
> have been made, so long as the record, the court's decision ordering

18

> prospective relief, and relevant caselaw fairly disclose that the relief actually
> meets the § 3626(b)(2) narrow tailoring standard. . . . Our reading is not a

19

> "disingenuous evasion," since Congress' objective was to limit relief to the
> constitutional floor.  If existing relief was so crafted according to the record

20

> and relevant caselaw, the findings required by the statute are implicit in the
> court's judgment.

21

Gilmore, 220 F.3d 987, 1007 n.25 (9th Cir. 2000) (citations omitted).

22

      261.    Here, the parties agreed that the Settlement Agreement & Order met the

23

PLRA's needs-narrowness-intrusiveness standard at the time it was entered.  Settlement

24

Agreement & Order, ¶ 15.  The Court fully approved of the Settlement Agreement &

25

Order, including the needs-narrowness-intrusiveness language as stipulated by the parties.

26

The relief was not overbroad and, indeed, defendants offered no evidence to the contrary.

27

Under the Ninth Circuit's rule set forth in Gilmore, then, "the findings required by the

28

1

statute are implicit in the court's judgment."  220 F.3d at 1007 n.25.

2

3

**B.     Termination Is Unwarranted Because Current and Ongoing Violations of Federal Constitutional and Statutory Rights Support the Continuation of Relief in this Case**

4

5

262.    Under the PLRA, termination of prospective relief is not appropriate if the

6

court makes written findings, based on the record, that "prospective relief remains

7

necessary to correct a current and ongoing violation of the Federal right, extends no

8

further than necessary to correct the violation of the Federal right, and . . . is narrowly

9

drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

10

This Court has already ruled that Defendants, as the party moving for termination, bear

11

the burden of proving that no such violations exist.  Order Regarding Burden of Proof,

12

April 2, 2010 (Dkt. # 382); see also Gilmore, 220 F.3d at 1007.  Defendants have failed to

13

prove that there are no violations.  On the contrary, even if Plaintiffs were to bear the

14

burden of showing such ongoing violations, they have met it.

15

263.    The Court heard six days of testimony and reviewed dozens of deposition

16

excerpts and over 700 exhibits.  The evidence demonstrates that plaintiff class members

17

continue to suffer current and ongoing violations of their federal rights and that those

18

violations are systemic.  As defendants have failed to carry their burden to show the

19

absence of current and ongoing federal rights violations, this Court concludes that the

20

prospective relief contained in the Settlement Agreement & Order remains necessary, is

21

sufficiently narrow, is minimally intrusive, and therefore shall not be terminated.

22

**1.     ADA and Section 504**

23

264.    It is undisputed that the Clark class members are qualified individuals with

24

disabilities entitled to protection from discrimination under Title II of the ADA and under

25

Section 504 of the Rehabilitation Act.  See 42 U.S.C. § 12132; 29 U.S.C. § 794.  As such,

26

Clark class members are entitled to "reasonable accommodations" and "reasonable

27

modifications" so that they can avail themselves of prison services and participate in

28

prison programs and activities.  See 29 U.S.C. § 794; 28 C.F.R. § 35.130(b)(7).

Defendants have failed to fulfill their obligation to provide plaintiff class members with the accommodations and program modifications that would enable them to gain access to the prison programs, services, and activities afforded non-disabled prisoners.  As a result many class members are effectively excluded from many prison programs, while others are forced to resort to a dangerous underground economy to buy assistance and protection from other prisoners.

### a.    Identification of Plaintiff Class Members

265.    Defendants are obligated under the ADA and § 504 to properly identify those prisoners requiring reasonable accommodations.  See Armstrong v. Davis, 275 F.3d 849, 876 (9th Cir. 2001); CRP at 14-16.  The evidence, however, including testimony from two experts in developmental disabilities, shows that the proportion of the prison population that defendants have identified as being developmentally disabled is dramatically lower than what is found in the general public and what reliable research predicts.

266.    The evidence presented strongly supports the inference that defendants have failed to identify and track many, if not the majority, of developmentally disabled prisoners in the CDCR, but further information and analysis is required to draw a definitive conclusion about the actual operation of CDCR's identification process.  The Court therefore will order defendants either to validate the current screening process through accepted scientific procedures or to adopt a process that has already been validated.  This issue is discussed further below.  See infra III.C.2

### b.    Reading and Writing

267.    Developmentally disabled prisoners whose reading skills are limited or non-existent are not provided assistance to ensure that they have an equal opportunity to participate in prison programs and activities, and to ensure that communication of information concerning services, activities and programs is "as effective" for them as for people without disabilities, in violation of the ADA, § 504, and the Clark Remedial Plan.

See 28 C.F.R. § 35.160(a); see also Garcia v. Taylor, No. 07-474, 2009 WL 2496521, at *11 (N.D. Fla. Aug. 11, 2009); Cruz v. Hauck, 627 F.2d 710, 720-21 (5th Cir. 1980); CRP at 6, 42, 45-46.

### c.  Assistance in Disciplinary, Administrative, Parole, and Classification Proceedings

268.   Clark class members do not receive "meaningful access" to disciplinary, administrative, parole, and classification proceedings.  Bonner v. Lewis, 857 F.2d 559, 562 (9th Cir. 1988).  Defendants have failed to provide assistance to ensure that communication in those proceedings is equally effective, thus violating plaintiff class members' rights under the ADA and § 504.  28 C.F.R. § 35.160(a).

### d.  Grievance Procedures

269.   Defendants have failed to maintain a grievance process that is "readily available to all . . . inmates."  28 C.F.R. § 40.3; Alexander v. Choate, 469 U.S. 287, 301 (1985); see also Bradley v. Hall, 64 F.3d 1276, 1279-80 (9th Cir. 1995).  In addition, defendants have not provided class members with a "prompt and equitable" grievance system for disability-related complaints.  28 C.F.R. § 35.107(b).

### e.  Assistance with Self-Care and Daily Living Activities

270.   Daily living activities, including the use of showers, the exchange of laundry, and the receipt of medication, constitute "services, programs, or activities" under the ADA and § 504.  See, e.g., Phipps v. Sheriff of Cook County, 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009) ("showering, toileting, and lavatory use . . . regarded as programs and/or services under the ADA"); see also Chase, 508 F. Supp. 2d at 502 ("Title II's accommodation requirement applies to almost every interaction between inmates and prison officials").  Therefore, the ADA and § 504 entitle plaintiff class members to reasonable accommodations, in the form of prompts or reminders from staff, to facilitate their use of these services.

271.   Defendants have failed to ensure plaintiff class members' access to these services through the use of prompts or reminders or any other accommodation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### f.      Staff Training

272.    The record reflects that staff training is essential to the provision of necessary services.  As noted below, this Court further concludes that the training envisioned by the Clark Plan is apparently insufficient on its own to meet the statutory minimal levels of care.  Therefore, training will be the subject of a further remedial order.

### 2. Eighth Amendment

273.    There is undeniably evidence in the record concerning incidents that raise constitutional concerns.  The record demonstrates that some deprivations are serious, but this Court cannot conclude that Defendants have been deliberately indifferent on a class-wide basis meriting class-wide prospective relief.

274.    As discussed exhaustively above, Defendants have enacted (thanks to the Clark Remedial Plan) a system of regulations that, if properly implemented, would largely cure the deprivations suffered by class members.  To date, however, this system has not been adequately implemented.  Given the fact that CDCR policies did indeed provide for constitutionally acceptable treatment, this Court cannot conclude that CDCR and State officials were deliberately indifferent to the entire class.  Individual prisoners have indeed suffered greatly, and perhaps some could bring individual actions under the Eighth Amendment against other state actors.  But that does not prove that the Eighth Amendment rights of the class in general have been violated by Defendants named in this case, and it does not justify system-wide injunctive relief based upon the Eighth Amendment.

275.    After being invited to submit objections to a preliminary version of this order, Plaintiffs objected to this conclusion.[18]  Plaintiffs cite to Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010), arguing that there is sufficient evidence "that the prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety."  Id. at 1150.  However, Thomas is not to the contrary.  Defendants' witnesses—particularly

---

[18]   Defendants were similarly invited to submit objections.  They chose not to do so.

those with supervisory roles within CDCR—testified consistently that, so far as they knew, the CRP was being adequately implemented.  While it is true that this Court has concluded that these witnesses were uniformly mistaken, and it is undeniable that these witnesses should have known of true conditions of the DDP program, we do not conclude that these witnesses were being insincere.  On the contrary, the size and bureaucratic structure of CDCR—in addition to the lack of a reliable self-assessment device—rendered these Defendants largely ignorant of the treatment suffered by class members.  This is particularly true of the more egregious events catalogued above, which, unlike the systemic ADA violations, appear to have been more isolated.  Defendants apparently believed CDCR policies, even if imperfectly implemented, would prevent such occurrences.  Although it is a close question, this Court concludes that Defendants did not have sufficient knowledge of the serious gaps in the DDP program to give rise to an Eighth Amendment violation with regard to the class.  Such a lack of malicious intent gives no cover with regard to the ADA and § 504, but without it there is no class-wide Eighth Amendment violation.

### 3. Fourteenth Amendment

276.    Plaintiffs argue that Defendants' conduct violates the Fourteenth Amendment.  So far as this Court can discern, however, the relief requested under the heading of Due Process is alternatively available under the ADA and § 504.  See Armstrong v. Davis, 275 F.3d 849, 861 (9th Cir. 2001) ("The ADA and Rehabilitation Act . . . require more than compliance with due process requirements: they require that a disabled individual be provided with 'meaningful access' . . . ." (emphasis added)).  Therefore, because this Court has separately ordered that the relief in question be provided under the ADA and § 504, and in order to avoid deciding an unnecessary constitutional issue, this Court declines to reach the issue of the Fourteenth Amendment.  See Harvey v. Brewer, 605 F.3d 1067, 1078 (9th Cir. 2010) (O'Connor, J., sitting by designation) ("The canon of constitutional avoidance . . . provid[es] that a court will not pass upon a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

constitutional question if there is some other ground upon which the case may be disposed
. . . .").

### C.    PLRA Exhaustion Requirements Are Not Applicable

277.    Defendants' termination motion is not saved by plaintiffs' failure to
demonstrate that they have exhausted their administrative remedies regarding the current
and ongoing violations of federal law found herein.

278.    The original complaint in <u>Clark v. California</u> was filed before the enactment
of the PLRA and therefore the PLRA exhaustion requirement found at 42 U.S.C. §
1997e(a) does not apply.  <u>Clark v. California</u>, No. 96-1486, 1998 WL 242688 at *2-3
(N.D. Cal. May 11, 1998) (PLRA does not apply because plaintiffs filed their original
complaint on April 22, 1996, four days before the PLRA amendments went into effect,
and amended complaint relates back to the date of the initial filing.); <u>see also</u> <u>Bishop v.
Lewis</u>, 155 F.3d 1094, 1095-96 (9th Cir. 1998).

279.    Likewise, neither the instant motion to terminate filed by defendants nor
plaintiffs' motion for enforcement triggers the exhaustion requirement.  The PLRA only
requires exhaustion when a new "action" is brought and a post-PLRA motion in a case
filed before the PLRA went into effect is not subject to the 1997a(a) requirement.  <u>See</u>
<u>Coleman v. Schwarzenegger</u>, No. 90-0520, 2008 WL 4813371 at *2 n.2  (E.D. Cal. Nov.
3, 2008) ("[t]he exhaustion requirement of the PLRA does not apply to motions that
exclusively [sought] the enforcement of the terms of' the consent decree" (internal
quotations omitted)).  Clearly, neither of the motions before the Court constitutes a new
action, and thus the PLRA exhaustion requirements are irrelevant.

### D.    The Relief Previously Ordered Remains Appropriate

280.    This Court concludes that the relief order in the Settlement Agreement
remains "narrowly drawn, extends no further than necessary to correct the violation of the
Federal right, and is the least intrusive means necessary to correct the violation of the
Federal right."  18 U.S.C. § 3626.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

281.   This is a case where "it would not be possible for a district court to produce meaningful need-narrowness-intrusiveness findings concerning each isolated provision of a remedial order.  Prospective relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law."  Amstrong v. Schwarzenegger ("Armstrong II"), No. 09-17144, slip op. at 13489 (9th Cir. Sept. 7, 2010).

282.   Based on the factual findings above, this Court concludes that continuation of the Clark Remedial Plan, given the fact that it is now interwoven with state regulations and is regarded as an essential plan by many state employees, imposes "the minimal impact possible on defendants' discretion over their policies and procedures."  Id.  The CRP "remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and . . . is narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).  Therefore, is it ordered that the entire Clark Remedial Plan remain in effect.

## II.   Defendants' Motion under Federal Rule of Civil Procedure 60(b)(5) Is Denied

283.   Defendants move to dismiss the Settlement Agreement & Order pursuant to Federal Rule of Civil Procedure 60(b)(5).  Under this rule, modification of an injunction is considered equitable when there has been a significant change in relevant law or factual circumstances.  Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383-84 (1992).  Modification may be warranted when changed factual conditions make compliance with the order substantially more onerous, when an order proves to be unworkable because of unforeseen obstacles, or when enforcement of the order without modification would be detrimental to the public interest.  Id. at 384-85.  If the moving party demonstrates that the modification is warranted, the court must then consider whether the modification is appropriately tailored to the changed circumstance.  Id. at 383.

284.   Defendants have offered no change in law or fact that provides a credible basis for the dismissal of the Settlement Agreement.  In fact, the evidence points in

1
2
3
4

exactly the opposite direction: as set forth in the Findings of Fact, current and ongoing violations of the federal rights of the plaintiff class warrant ongoing Court supervision, not a dismissal of relief.  In the absence of legal or factual support, defendants are not entitled to dismissal of relief simply because ongoing Court supervision is inconvenient.

5
6

### III.   Further Remedial Orders Are Necessary to Remedy the Current and Ongoing Violations of the Federal Rights of Plaintiff Class Members

7
8
9
10
11
12
13
14

285.    Based on the evidence set forth in the Findings of Fact, the Court concludes that further relief is necessary to secure the rights of the plaintiff class.  The Remedial Plan, while universally acknowledged to be a worthy effort, has proven, as implemented, inadequate to ensure defendants' full compliance with the ADA, § 504, and the Fourteenth Amendment with regard to plaintiff class members.  The Court finds that the systemic nature of the violations demands systemic remedies as set forth below, and Plaintiffs' motion for further remedial orders is therefore GRANTED IN PART.  To the extent that motion requests relief that is not herein ordered, such further relief is DENIED.

15

### A.    The Court Has the Power to Issue Further Remedial Orders

16
17
18
19

286.    The Settlement Agreement and Order in this case grants the Court "jurisdiction to enforce the terms of this agreement" and "the power to enforce the agreement through specific performance and all other remedies permitted by law." Settlement Agreement and Order, Dec. 3, 2001 (Docket # 194), ¶ 5.

20
21
22
23
24
25

287.    The terms of the Settlement Agreement that the Court has the power to enforce include defendants' duties to identify developmentally disabled prisoners; to properly classify, house and protect them; and to ensure non-discrimination against them, including meaningful access to CDCR forms and processes, such as sick call, grievances, and disciplinary and classification proceedings.  Id. at ¶ 4 (defendants shall fully implement Clark Remedial Plan); CRP at 1, 8.

26
27
28

288.    Under the PLRA, the Court may not issue a  remedial order unless it is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

right."  18 U.S.C. § 3626(a)(1)(A).  Based on the findings set forth above, the Court finds that the further relief ordered herein meets this needs-narrowness-intrusiveness standard.

289.   While the PLRA requires remedies that are narrowly tailored and the least intrusive to remedy the rights violations, "it is also the duty and responsibility of this Court to ensure that constitutional rights are fully vindicated."  Madrid v. Gomez, 889 F. Supp. 1146, 1282 (N.D. Cal. 1995).  "Therefore, a federal court may order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation," and in fashioning such relief, may take into account a history of noncompliance with prior orders.  Toussaint v. McCarthy, 801 F.2d 1080, 1087 (9th Cir. 1986), *abrogated in part on other grounds by* Sandin v. Conner, 515 U.S. 472 (1995); see also Plata v. Schwarzenegger, 603 F.3d 1088, 1098 (9th Cir. 2010) (appointment of receiver approved where defendants failed to prove that lesser remedies could have addressed constitutional violations).

### B.     Further Remedial Orders Are Necessary Because Defendants Cannot Remedy their Violations

290.   The Court concludes that denying defendants' termination motion without additional action would be insufficient to remedy defendants' violations of federal law. This conclusion is based on four sets of facts.  First, defendants have demonstrated an inability to remedy the problems that have been identified by the Court expert and others. Further orders are therefore necessary.  Second, defendants have demonstrated an inability to take remedial steps absent court intervention.  Third, the Court has already ordered defendants to comply with the Remedial Plan, in the 2001 Settlement Agreement & Order, but the evidence reflects that Defendants have failed to do so even nine years later. Fourth, the Remedial Plan in its current form does not go far enough to ensure compliance with the ADA and § 504.  Further remedial orders are required to correct these violations.

### C.     Further Remedial Orders Are Required

291.   In determining the appropriate remedy, the Court must balance the deference due the State in the administration of its prison system, the Court's duty to

- 103 -

ensure that the rights of the plaintiff class are safeguarded, and the limitations of the PLRA. The Court will therefore allow defendants the opportunity to develop amendments to the Remedial Plan to remedy the current and ongoing violations.

### 1.    Staff Training

292.    The evidence demonstrated that some staff, even after presumably receiving the required training, failed to provide necessary assistance and failed to make necessary inquiries. See generally Findings of Fact § II.C. The current training regimen is clearly inadequate to prepare staff members to adequately preserve Plaintiffs' rights. The training provided in CDCR must be improved through consultation with experts and plaintiffs' counsel. Defendants object that this Court has no power to order any kind of training regimen. They are incorrect. See Armstrong v. Davis, 275 F.3d 849, 875-76 (9th Cir. 2001).

### 2.    Identification and Classification

293.    As noted in the Findings of Fact § II.B, *supra*, the Court is not confident that defendants are properly identifying plaintiff class members through their implementation of the Remedial Plan's testing procedures. As a consequence, it appears likely that a class of individuals is not being provided with the services to which it is legally entitled. Defendants must either (a) validate the current identification process or (b) develop a new validated system for testing and identifying class members.

294.    The Court is also concerned that the classification of prisoners as DD1, DD2, and DD3 does not provide adequate guidance about the needs of specific prisoners. Some staff labored under misconceptions regarding what assistance was necessary for what designation–for example, that DD1 prisoners need no help at all. See, e.g., Scaramozzino at RT 868:19-21. These misconceptions are particularly problematic given two characteristics of the developmentally disabled population. First, all people designated as developmentally disabled have very significant deficits requiring a great deal of help. Cowardin at RT 620:23-25, 630:4-631:18; Expert Report of Nancy

Cowardin, Ph.D (Tr. Ex. 5) (Cowardin Report), at 17-18.  Second, no person is entirely DD1 or DD2 or DD3.   People have varying abilities in different areas.  Cowardin at RT 620:23-25, 621:7-20, 626:15-25; Cowardin Report at 17-18.  Thus, a developmentally disabled person might have good grooming and self-care skills, but be extremely vulnerable to exploitation by others.  Another developmentally disabled person might be able to read but not to advocate for himself or herself in due process proceedings. Defendants must develop and use more specific forms for identifying the specific deficits and needs of individual members of the plaintiff class.

295.   In consultation with the Court experts and plaintiffs' counsel, defendants shall develop and use more specific forms for identifying the specific deficits and needs of individual members of the plaintiff class.

### 3.      Self-Monitoring

296.   Defendants do not perform the self-audits required by the Remedial Plan. Wells at RT 455:6-22, 456:8-10; CRP at 62.  The need for such audits is manifest in the ignorance of the testifying officials regarding severe systemic compliance problems at the prisons.  Although officials testified as to their intentions to implement a self-audit tool, the Court will set specific dates to ensure compliance.

297.   Defendants must consult with the Court experts and with plaintiffs' counsel, who have expertise in this area essential to the process, regarding the adequacy of their audit tool.

### D.      Determining the Proper Remedy

298.   Defendants are therefore ORDERED to prepare a plan to address these three independent areas requiring further relief.  This Plan shall consist of specific amendments to the current Remedial Plan that will remedy the above-noted legal deficiencies.

299.   Defendants shall submit their plan, including a draft of the audit tool, to the Court's experts and to the Prison Law office, by December 15, 2010.  The experts and parties shall meet and confer, as necessary.  If any disputes remain, the Court experts shall

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

resolve them.  If either party disagrees with the Court experts' resolution, or if the Court experts are unable to agree, either party may bring the dispute to the Court for resolution by way of a noticed motion.

300.    Plaintiffs have also requested an order directing defendants to present a plan for remedying ongoing violations of the CRP.  The Court declines to do so at this time for two reasons.  First, continuing Court supervision and ordering compliance with the Clark Plan is, in itself, an order to remedy such ongoing violations.  Second, while Plaintiffs are correct that these violations occurred even while the Clark Plan was in force, this Court is hopeful that implementation of a comprehensive audit toll will result in more effective self-oversight.  Defendants' witnesses time and again suggested that plaintiffs' allegations could not be accurate because CDCR policies are to the contrary.  Indeed, the record is replete with evidence of defendants' unawareness that CDCR policies are not consistently implemented. Once defendants are capable of assessing the gap between their policies and reality, this Court is hopeful that they will be able to better meet plaintiffs' needs. Developing another "plan" simply raises the question of whether that plan, unlike the previous one, will be followed.  In the end, no plan will be successful unless defendants are able to properly evaluate whether their policies are being implemented.

**E.    Miscellaneous**

301.    Pursuant to Federal Rule of Evidence 706(b) and the Settlement Agreement and Order of December 3, 2001, defendants shall pay the Court expert for his work in connection with the termination and enforcement motions in this case.

302.    The automatic stay of prospective relief entered pursuant to 18 U.S.C.

//
//
//
//
//

§ 3626(e)(2) is hereby vacated.

**IT IS SO ORDERED.**

September 16, 2010

_____
The Honorable Charles R. Breyer
United States District Judge